UNITED STATES of America,
Plaintiff–Appellee,

v.

Windyceslau D. LORENZO,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Roger ELVICK, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Nathan K. BROWN, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Ron KNUTT, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Thomas PORTER, Defendant–Appellant.

Nos. 91–10506 to 91–10509 and 91–10513.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 14, 1992.*

Decided May 11, 1993.

* The panel unanimously finds *United States v. Lorenzo* and *United States v. Knutt* suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a), Ninth Circuit R. 34–4.

Richard T. Pafundi, Honolulu, HI, for defendant-appellant Lorenzo.

Lane Y. Takahashi, Honolulu, HI, for defendant-appellant Elvick.

Thomas D. Collins, III, Honolulu, HI, for defendant-appellant Brown.

Wayne H. Tashima, Honolulu, HI, for defendant-appellant Knutt.

Robert Finlay, Honolulu, HI, for defendant-appellant Porter.

Lawrence L. Tong, Asst. U.S. Atty., Honolulu, HI, for plaintiff-appellee.

Before GOODWIN, O'SCANNLAIN, and RYMER, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

This appeal raises a number of issues concerning the use of a tax protest scheme designed to harass public officials and private individuals against whom some of the appellants had grievances.

I

On October 18, 1990, a grand jury sitting in the District of Hawaii returned a seventy-nine count indictment charging fifteen individuals with various violations arising out of their use of a tax protest method known as the "redemption" scheme. Eleven of the defendants are residents of Hawaii (the "Hawaiian defendants"), including appellants Nathan Brown and Windyceslau Lorenzo. The four other defendants, including appellants Roger Elvick, Ron Knutt, and Thomas Porter, are from North Dakota and Minnesota (the "North Dakota defendants"). The indictment charged that the defendants conspired, in violation of 18 U.S.C. § 371, to file false documents with the IRS and to impede the administration of justice. The substantive offenses underlying the conspiracy included making false statements in forms filed with the IRS in violation of 18 U.S.C. § 1001, endeavoring to impede a judicial officer in violation of 18 U.S.C. § 1503, mail fraud under 18 U.S.C. § 1341, and filing false tax claims under 18 U.S.C. § 641.

According to the appellants, redemption theory promotes the use of federal income tax forms by an "injured party" as a means of retaliating against those deemed responsible for wrongs to that person. If the government, or a business, institutes an "unjustified" legal action against that person, the person seeks "redemption" by harassing the individuals responsible and attempting to impede them in their official duties. The individual victim receives an IRS 1099–MISC form from the "injured party" stating that the victim had received an amount of miscellaneous income from the sender. In addition, the "injured party" seeks to collect, as "money damages," a tax refund from the government.

One of the appellants, Roger Elvick, put together instructional materials consisting of videotapes, audiotapes, and printed material that explain how to implement the redemption scheme. The materials were available for purchase by mail-order from another appellant, Ronald Knutt. Appellant Thomas Porter and Juanita Dewey acted as consultants, helping to explain to purchasers how to use the redemption scheme. In 1990, Elvick, Knutt, and Porter were convicted of conspiracy in federal district court in North Dakota, and Dewey in Minnesota, based on their promotion of the redemption scheme and their personal efforts to use it to receive tax refunds. All three North Dakota appellants are currently incarcerated due to those convictions. A conspiracy indictment against Elvick in the Western District of Texas was apparently dismissed because of his North Dakota conviction.

In this case, a group of "native Hawaiian activists" happened upon the redemption scheme. With guidance from the North Dakota defendants, the Hawaiian defendants

used the scheme against a number of state and federal officials against whom they had grievances. For example, appellant Nathan Brown obtained a rural housing loan through the Farmers Home Administration, an agency of the Department of Agriculture, to finance the purchase of his house. Brown later refused to continue making payments on his loan, arguing that he was a citizen of the Sovereign Kingdom of Hawaii and that the land had been illegally sold to him. After the government, represented by the U.S. Attorney's Office, instituted a civil foreclosure action against him, Brown employed the redemption scheme against District Court Judge Ezra, U.S. Attorney Daniel Bent, the Assistant U.S. Attorney who handled the case, officials of the city and county, and individuals at the Farmers Home Administration. Brown filed a tax return seeking a refund of $1,344,834.79.

Brown also was involved, along with Lorenzo, in a dispute with the State of Hawaii Department of Land and Natural Resources ("DLNR"). Lorenzo and his family squatted on land leased by the DLNR to flower growers. Lorenzo told the DLNR that he was a "sovereign heir" entitled to occupy and possess Hawaiian crown lands. After the state evicted Lorenzo, he employed the redemption scheme against various individuals involved in the eviction, filing false 1099 forms showing payment of compensation to twelve individuals including the governor of Hawaii, the State Attorney General, the chairman of the DLNR, and other DLNR employees. Lorenzo filed a tax return seeking a refund of $748,960. The IRS issued a refund check for $458,348 which was intercepted from Lorenzo's mailbox after the IRS realized Lorenzo's return was fraudulent.

The district court divided the case into three trials. Appellants Brown and Lorenzo were tried as part of the second trial group. After trial, Brown was convicted by the jury of eighteen counts, and the jury was unable to reach a verdict as to one count. He was sentenced to seventy-eight months in prison. Lorenzo was convicted by the jury of fifteen counts. He was sentenced to thirty-three months imprisonment and three years supervised release.

The third trial group consisted of appellants Elvick, Knutt, and Porter, as well as Dewey. Elvick, Knutt, and Porter contested the jurisdiction of the court and refused to identify themselves at the beginning of the proceedings. The district court allowed them to proceed pro se but appointed standby counsel to act as their legal advisors. The appellants then brought a pro se motion to dismiss based on lack of venue and jurisdiction. The district court denied their motion. Elvick and Knutt instructed their legal advisors not to participate at trial. As Porter's mandate to his counsel was more ambiguous, his counsel participated at trial. Consistent with their belief that the court had no jurisdiction, Elvick, Knutt, and Porter refused to attend the trial after jury selection.

Elvick, Knutt, and Porter were each convicted by the jury of one count of conspiracy. Elvick was sentenced to sixty months in prison; Knutt also received sixty months; Porter received fifty-seven months. Their sentences are to run consecutively to their North Dakota sentences.

## II

■ Appellants Brown and Lorenzo argue that, because the U.S. Attorney and several assistants were "victims" and testified as witnesses at trial, the U.S. Attorney's Office should have recused itself from prosecuting the case. Brown and Lorenzo contend that the district court's refusal to disqualify the entire U.S. Attorney's Office for the District of Hawaii was error.

■ This court has already rejected this contention in a related appeal. *See United States v. Hoapili*, No. 91–10448, 1992 WL 379398.(9th Cir. Dec. 17, 1992). A federal prosecutor may testify at a trial in which he is participating only if there is a compelling need. *United States v. Tamura*, 694 F.2d 591, 601 (9th Cir.1982). Here, none of the members of the U.S. Attorney's Office who testified participated in the prosecution; rather, the case was prosecuted by an Assistant U.S. Attorney who was not a member of the office at the time the crimes were committed and who had not received false 1099 forms. Moreover, the testimony of the mem-

bers of the office who did testify was necessary to show that they had not received the income reported by the appellants.

■ The appellants also contend that recusal was mandated by the guidelines promulgated in the U.S. Attorneys' Manual. *See* U.S. Attorneys' Manual, § 1–3.170 (conflict of interest exists when a member of a U.S. Attorney's Office has a personal interest in the outcome of a matter). The appellants assert that the testimony of the U.S. Attorney makes this an "exceptional case," requiring "the recusation of all the members of [the] office." U.S. Attorneys' Manual, § 1–3.170. However, the U.S. Attorneys' Manual "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal." U.S. Attorneys' Manual, § 1–1.100. Moreover, the U.S. Attorney's Office followed the appropriate procedures as set out in the Manual.

■ Finally, the appellants contend that this prosecution created the appearance of conflict. *See* Model Code of Professional Responsibility DR 5–102. However, even were we to hold that the vicarious disqualification rules apply to a U.S. Attorney's Office,[1] the appellants have not demonstrated prejudice. The D.C. Circuit has held that "[w]ith regard to an appearance of conflict on the part of the prosecution, on appeal a defendant has cause to complain only if he was prejudiced." *United States v. Heldt,* 668 F.2d 1238, 1277 (D.C.Cir.1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). That court recognized that, "[w]hile the prosecutor's duty 'to seek justice' cannot be minimized, the less fundamental nature of the threat to defendants, coupled with the government's responsibility to administer justice effectively on the public's behalf, makes actu-

al prejudice the appropriate standard." *Id.* at 1277 n. 83 (citation omitted). Here, the lack of prejudice to the appellants is underscored by the fact that there is no suggestion that these charges were brought because of the victimization of the U.S. Attorney himself; nor is there any suggestion that the U.S. Attorney's Office did not exercise its discretionary function in an even-handed manner or that its zeal was not born of objective and impartial consideration of the merits of this case. *Cf. People v. Conner,* 34 Cal.3d 141, 193 Cal.Rptr. 148, 151, 666 P.2d 5, 8 (1983).

The cases cited by Brown in his reply brief do not compel the opposite conclusion. Even those cases recognize that the question of disqualification is largely within the discretion of the trial court. *See People v. Garcia,* 698 P.2d 801, 807 (Colo.1985); *Conner,* 193 Cal.Rptr. at 152, 666 P.2d at 9. We conclude that the district court did not abuse its discretion by ruling that the prosecution of this case by an Assistant U.S. Attorney who was not a member of the office at the time of the crimes did not create a conflict of interest or an impermissible appearance of impropriety. Accordingly, we affirm the district court's refusal to disqualify the entire U.S. Attorney's Office for the District of Hawaii.

### III

■ The prosecution used its six peremptory challenges to strike Fauona Vaifa, Norman Kahoiwai, Cara Snow, Patricio Clarin, Edward Akuna, and Roy Santo from the jury. Brown and Lorenzo argue that the prosecution's challenges to Vaifa, Kahoiwai, and Akuna, the three potential jurors "with Hawaiian or Polynesian surnames," were racially motivated, thereby violating the Fourteenth Amendment. *See Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The racially-based exclu-

---

1. The general trend of the law has been to limit the applicability of the vicarious disqualification rules to private organizations. *See United States v. Caggiano,* 660 F.2d 184, 191 (6th Cir.1981), *cert. denied,* 454 U.S. 1149, 102 S.Ct. 1015, 71 L.Ed.2d 303 (1982); *United States v. Hubbard,* 493 F.Supp. 206, 208 (D.C.1979), *aff'd,* 668 F.2d 1238 (1981), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982); *see also United States v. Judge,* 625 F.Supp. 901, 902 (D.Haw.

1986) (questioning applicability of vicarious disqualification rule to Federal Public Defenders office), *aff'd,* 855 F.2d 863 (9th Cir.), *cert. denied,* 488 U.S. 959, 109 S.Ct. 402, 102 L.Ed.2d 390 (1988); *People ex rel Younger v. Superior Court (Rabaca),* 86 Cal.App.3d 180, 150 Cal.Rptr. 156, 164 (1978) (content of DR 5–102 has little application except to law firms engaged in practice for remuneration and would be nonsensical if applied to multi-deputy district attorney's office).

sion of even a single juror violates the Fourteenth Amendment. *United States v. Bishop*, 959 F.2d 820, 827 (9th Cir.1992).

■ The government contends that the appellants have failed to show that the circumstances of the jury selection raise an inference that the prosecutor used his challenges to exclude the venire members from the petit jury on account of their race and therefore have failed to make out a prima facie case of purposeful discrimination. *See United States v. Power*, 881 F.2d 733, 739–40 (9th Cir.1989). However, the district court required the government to state its reasons for "having challenged at least the two persons with Hawaiian surnames, Akuna and Kahoiwai." [2] The government responded by articulating neutral explanations for striking all three veniremen. We will therefore assume that the appellants have made the requisite prima facie showing and examine whether the district court clearly erred in accepting the government's proffered explanations. *See id.* at 740; *see also Bishop*, 959 F.2d at 824.

According to the government, Vaifa, a Samoan chieftain, was challenged because he had fallen asleep during voir dire and because he had walked in and out of the voir dire at times when the jurors were not supposed to be present. The prosecutor stated that he "got the feeling that he was somewhat disoriented ... and, again, my consistent theme here is I would prefer people who have more attentiveness, a little older and educated." Lack of attentiveness is a neutral, reasonable basis for the use of a peremptory challenge. *See Power*, 881 F.2d at 740.

■ The government also offered a neutral explanation for the challenge to Akuna. He asked to be excused on the ground of hardship because he was the only person in his family who worked and he would not be paid for his construction job during the length of the trial. The court considered excusing Akuna but felt constrained by the dwindling number of available jurors. The court suggested to counsel on several occa-

sions that they consider for peremptory challenges those venire members who had asked to be excused. The government based its challenge to Akuna on the concern that he might hold his loss of two or three weeks pay against the prosecution. The district court accepted this neutral explanation for the prosecution's challenge to Akuna.

■ On the other hand, the district court expressed some concern over the challenge to Kahoiwai. The prosecution explained that, in a "politically charged" case such as this, it preferred not to have jurors who might question the importance of government. The prosecution noted Kahoiwai's "long, unkempt" hair and "long" beard and "associated his appearance with the counter-culture beliefs of 'hippies.'" In addition, the prosecution worried about his level of education and the fact that he was employed at Pearl Harbor shipyard where there recently had been a major fraud prosecution.

In response to the government's explanation, the court noted that two defendants had beards and a third had long hair. The court was "somewhat disturbed at the government's attitude toward persons with long hair and beards," but concluded that there was nothing in the law to preclude the government from challenging a person who wears a beard. While "the fact that the potential juror might identify too much with the defendant because they are of the same race is clearly not [appropriately neutral]," *United States v. Alcantar*, 897 F.2d 436, 440 (9th Cir.1990); *see also Bishop*, 959 F.2d at 825–26 (use of residence as surrogate for racial stereotype violates equal protection), concern that a juror may identify with the defendant for other reasons suffices as a neutral explanation. *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987).

■ There is a well-recognized tension between the concept of the peremptory challenge and the *Batson*-based need to articulate clear and specific reasons for the use of such a challenge. Thus, a facially valid ex-

---

2. Vaifa is, in fact, Samoan. Apparently because he was not Hawaiian, the court did not explicitly rule on the government's explanation for striking Vaifa. However, the court heard the government's explanation at the appellants' insistence and later denied the *Batson* challenge as a whole.

planation need not rise to the level of a challenge for cause. *Power*, 881 F.2d at 740. Moreover, "[s]uch reasons may not be logical"—"[t]hey are often founded on nothing more than a trial lawyer's instinct about a prospective juror." *Thompson*, 827 F.2d at 1260. For that very reason, great deference is paid to the district judge, who has the opportunity to observe the full jury selection process first-hand. *Power*, 881 F.2d at 740; *United States v. Chinchilla*, 874 F.2d 695, 697–98 (9th Cir.1989).

In this case, the district court indicated several times that it was concerned that there be Hawaiian jurors and so there is reason to believe that the court was vigilant in guarding against discrimination. Moreover, in considering the circumstances and the legitimacy of the prosecution's proffered explanations, the court was entitled to consider that fully half of the seated jurors were at least partly Hawaiian. We see no reason to question the court's conclusion that the explanations proffered by the government were not pretextual. The appellants do not point to anything that undermines that conclusion. For example, they do not argue that any of the non-excluded jurors shared any of the characteristics cited by the government for excluding Vaifa, Akuna, or Kahoiwai. *See Thompson*, 827 F.2d at 1260; *see also Chinchilla*, 874 F.2d at 699 (O'Scannlain, J., dissenting). Accordingly, we hold that the district court's finding that the government did not engage in purposeful discrimination in the jury selection process was not clearly erroneous.

## IV

The appellants contend that the district court erred in refusing to instruct the jury that it could consider the appellants' good faith, but erroneous, belief that their actions were legal. The appellants argue that good faith error negates the willfulness elements of 18 U.S.C. §§ 371 and 1001. However, the appellants' reliance on *Cheek v. United States*, 498 U.S. 192, 202–04, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991), as support for their proposition is wholly misplaced.

Despite the fact that 18 U.S.C. § 1001 does not ordinarily invite the use of a good faith instruction, the appellants argue that a *Cheek* instruction was proper because their case involved a tax matter. But the appellants were charged with violating the general prohibition against making false statements to the government, not with a criminal tax offense. The Eighth Circuit has recently rejected the same argument in a case arising out of the use of the same redemption scheme at issue here. *See United States v. Hildebrandt*, 961 F.2d 116, 118–19 (8th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 225, 121 L.Ed.2d 162 (1992). The Tenth Circuit has also refused to extend the holding in *Cheek* beyond the special realm of tax law violations. *See United States v. Dashney*, 937 F.2d 532, 540 (10th Cir.) (currency reporting), *cert. denied*, —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991). The exception to the traditional definition of willfulness relied on by the Supreme Court in *Cheek* turns entirely on the "special treatment of criminal tax offenses . . . due to the complexity of the tax laws." *Cheek*, 498 U.S. at 200, 111 S.Ct. at 609. Nothing in the language or rationale of *Cheek* supports the appellants' expansive interpretation of that case. *See Hildebrandt*, 961 F.2d at 119. Furthermore, this circuit has repeatedly held that a " 'defendant is not entitled to a separate good faith instruction when the court adequately instructs on specific intent.' " *United States v. Rushton*, 963 F.2d 272, 274 (9th Cir.1992) (quoting *United States v. Bonanno*, 852 F.2d 434, 440 (9th Cir.1988), *cert. denied*, 488 U.S. 1016, 109 S.Ct. 812, 102 L.Ed.2d 801 (1989)). The district court's refusal to give a *Cheek* instruction was not error.

## V

The appellants contend that the district court abused its discretion by allowing some of the "victims" to testify as to their feelings or reactions upon receiving false 1099 forms. Of twenty-six government witnesses who testified about dealings with the appellants, fifteen testified about their reaction to receiving the 1099 forms. Of those fifteen, there is no dispute that such testimony was admissible from Judge Ezra, U.S. Attorney Bent, and two Assistant U.S. Attor-

neys because it was relevant to whether those witnesses had been impeded in the performance of their duties under 18 U.S.C. § 1503. Of the remaining witnesses, the appellants only objected to reaction testimony from the last eight.

The appellants were not charged with sending 1099 forms to the individual victims, rather they were charged with sending false forms to the IRS. Thus, the appellants argue that the witnesses' reactions went to a non-issue in the case and was not relevant. However, the appellants repeatedly placed the question of the effect of the documents at issue. Therefore, the district court did not abuse its discretion by finding the testimony relevant. *Cf. United States v. Carpenter*, 933 F.2d 748, 751 (9th Cir.1991).

■ Moreover, we reject the appellants' contention that the testimony should have been excluded under Federal Rule of Evidence 403 as being more prejudicial than probative. The evidence simply was neither particularly inflammatory nor confusing. *See United States v. Johnson*, 820 F.2d 1065, 1069 (9th Cir.1987). Indeed, the appellants failed to object to the same testimony from seven other witnesses. Thus, we cannot say that the district court abused its wide latitude in admitting this testimony. *See United States v. Kinslow*, 860 F.2d 963, 968 (9th Cir.1988), *cert. denied*, 493 U.S. 829, 110 S.Ct. 96, 107 L.Ed.2d 60 (1989). In any event, the admission of this testimony certainly was harmless, given the overwhelming evidence of the appellants' guilt.

## VI

■ Appellants Brown and Lorenzo contend that they are Hawaiian nationals and therefore the federal district court had no jurisdiction to hear this case. We review the district court's jurisdiction de novo. *United States v. Peralta*, 941 F.2d 1003, 1010 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1484, 117 L.Ed.2d 626 (1992). The appellants have presented no evidence that

the Sovereign Kingdom of Hawaii is currently recognized by the federal government or that they have received any immunity arising from the existence of the Kingdom. Accordingly, as all the violations occurred in the district of Hawaii, venue was proper under Rule 18 of the Federal Rules of Criminal Procedure and jurisdiction was proper under 18 U.S.C. § 3231.

## VII

In his reply brief, appellant Knutt asserts that the district court committed error when it failed to examine on the record his waiver of the right to counsel. We review for plain error. *See United States v. Ullah*, 976 F.2d 509 (9th Cir.1992) (court will consider argument not raised in opening brief if failure to do so will result in manifest injustice); *see also United States v. Dujanovic*, 486 F.2d 182, 184 (9th Cir.1973) (circumstances surrounding the waiver of counsel can constitute plain error).

■ Knutt claims that his refusal to identify himself in court should have raised doubts in the district court's mind about his rationality.[3] However, he identifies no other behavior that should have raised a good faith doubt about his ability to understand the nature and consequences of his waiver, or to participate intelligently in the proceedings and make a reasoned choice among the alternatives presented. *See Harding v. Lewis*, 834 F.2d 853, 856 (9th Cir.1987), *cert. denied*, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); *cf. Hernandez v. Ylst*, 930 F.2d 714, 717–18 (9th Cir.1991) (identifying factors that raise questions regarding defendant's competency). The fact that the court held a hearing to determine whether Porter was competent demonstrates that the court was alert to the issue. Thus, the court's failure to hold a competency hearing or make specific findings as to Knutt's competency was not plain error.

■ Knutt also contends that the record does not establish that his waiver of counsel

---

**3.** Apparently on the advice of counsel, none of the appellants identified themselves at the initial hearing. Their motivation appears to have been to protest the venue and to challenge jurisdiction. In other words, they believed that by participating, they would be recognizing the jurisdiction of the United States.

The magistrate judge held a hearing to determine Porter's competency but did not do so with regard to Knutt.

was knowing and intelligent. When conducting an inquiry into whether the waiver of counsel was knowing and intelligent, this circuit requires proof that the defendant understood his "constitutional right to have [a] lawyer perform certain core functions," and that he "appreciate[d] the possible consequences of mishandling these core functions and the lawyer's superior ability to handle them." *United States v. Kimmel*, 672 F.2d 720, 721 (9th Cir.1982). "The preferred procedure to ensure that a waiver is knowingly and intelligently made is for the district court to discuss with the defendant, in open court, whether the waiver was knowingly and intelligently made, with an understanding of the charges, the possible penalties, and the dangers of self-representation." *United States v. Balough*, 820 F.2d 1485, 1488 (9th Cir. 1987).

At their December 10, 1990 hearing before a magistrate judge, the appellants indicated that they wanted to represent their own interests but that they also would like standby counsel appointed. Elvick told the court that he had effectively used such a procedure before. There was also some indication that the appellants were receiving advice from counsel in North Dakota. After assigning counsel, the magistrate judge recessed the hearing for two days, in part to allow the appellants to read the indictment.

At the next hearing, on December 12, 1990, the appellants appeared with their standby counsel. The magistrate judge urged Elvick, Knutt, and Porter to accept the advice of counsel and warned them that they would be "very disadvantaged" without the aid of counsel. The magistrate judge then inquired of counsel whether they had been able to meet with the appellants to discuss and explain the indictment. Knutt's standby counsel told the court that Knutt had the opportunity to read and review the indictment and that Knutt seemed competent and intelligent

enough to understand it. Knutt did not object to counsel's statements.

We recognize that our inquiry must focus on what Knutt understood at the time of his decision, and not what the court said or understood. *Balough*, 820 F.2d at 1487–88. However, Knutt has not explained how the court's efforts to warn him about the dangers of representing himself were deficient or what he failed to understand. Thus, we must conclude that the court did not commit plain error.

## VIII

### A

■ Appellants Elvick and Knutt argue that their trial and conviction for conspiracy violated the Double Jeopardy Clause of the Fifth Amendment because they had already been convicted in North Dakota of conspiracy for their use of the redemption scheme. They did not, however, explicitly raise such an objection at trial. Thus, the government contends that they have waived their right to raise a double jeopardy claim on appeal.

■ Failure to present a double jeopardy challenge constitutes a waiver of that claim. *Haddad v. United States*, 349 F.2d 511, 514 (9th Cir.1965); *see United States v. Broce*, 488 U.S. 563, 568, 109 S.Ct. 757, 761, 102 L.Ed.2d 927 (1989) ("the protection against double jeopardy is subject to waiver") (citing *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987)); *see also United States v. Harris*, 959 F.2d 246, 251 n. 2 (D.C.Cir.1992). Such a conclusion is particularly apt where, as here, "the [alleged] constitutional error presented itself at the commencement of the second trial." *United States v. Devine*, 934 F.2d 1325, 1342–43 (5th Cir.1991). Elvick and Knutt argue that, despite their waiver, we can review their double jeopardy claim for plain error. It is not clear whether we can review for plain error a double jeopardy claim that has been waived.[4]

---

4. The government complains that applying plain error invites a waste of judicial resources because it allows the appellants to test the government's proof at trial before bringing a double jeopardy claim. The government also complains that plain error analysis is difficult to undertake because the issue turns on facts not in the record, a circumstance directly traceable to the appellants' failure to make a timely objection. That assertion has some merit. However, the appellants bear the burden of showing that the conspiracy for which they were tried and convicted in Hawaii is the same conspiracy for which they were convicted in North Dakota. *United States*

*Compare Haddad,* 349 F.2d at 514 (failure to plead former jeopardy constitutes waiver) *with Devine,* 934 F.2d at 1343 (applying plain error analysis where defendant failed to raise double jeopardy claim); *Government of the Virgin Islands v. Smith,* 445 F.2d 1089 (3d Cir.1971) (same); *State v. Miyazaki,* 64 Haw. 611, 645 P.2d 1340, 1344 (1982) (same). We do not need to decide, however, whether plain error analysis applies because, even assuming that it does, the appellants' double jeopardy claim fails.

## B

The appellants characterize their conduct as part of a single conspiracy with a national scope, operated out of North Dakota, with its primary goal being to impede the administration of justice by filing false statements with the IRS. In their view, the Hawaiian defendants were merely a subgroup of the conspiracy acting locally in pursuit of the national goal. The appellants argue that as the redemption scheme spread the IRS launched a national investigation coordinated from North Dakota. They complain that, by breaking one conspiracy into parts, the government is unfairly taking advantage of the nebulous nature of the crime of conspiracy.

On the other hand, the government portrays the Hawaiian conspiracy as an agreement to impede the administration of justice and to harass the Hawaiian defendants' adversaries. The government argues that the North Dakota participants knew of the Hawaiian defendants' sovereignty claims and their specific land disputes and agreed to help them achieve their ends, while the objective of the North Dakota agreement was to claim tax refunds and to pursue the North Dakota defendants' particular local grievances.

▆▆▆▆ To determine whether two separate and distinct criminal agreements were entered into by the appellants, "we compare

the differences in the periods of time covered by the alleged conspiracies, the place where the conspiracies were alleged to occur, the persons charged as co-conspirators, the overt acts alleged to have been committed, and the statutes alleged to have been violated." *Guzman,* 852 F.2d at 1120 (internal quotations omitted). No single factor controls the determination whether there was a single conspiracy; after consideration of all, the question remains whether there was more than one agreement. *Id.* at 1121.

Our analysis of the factors identified in *Guzman* does not persuade us that the two conspiracies were the same in law and in fact. Although there was a significant overlap in the time periods during which the two conspiracies were alleged to have occurred, there was little actual overlap in the locations of the conspiracies. Seventy-eight of the seventy-nine counts in the Hawaii indictment charged substantive offenses committed in Hawaii. *Cf. Guzman,* 852 F.2d at 1120; *United States v. Bendis,* 681 F.2d 561, 568 (9th Cir.1981) (even where both conspiracies had "important connections" with Cleveland, Ohio, their scopes implicated different parts of the world). Moreover, although Dewey, Elvick, Knutt, and Porter had previously been charged with conspiracy arising from the redemption scheme, the eleven other defendants were only charged in connection with the Hawaiian activities. *See Guzman,* 852 F.2d at 1121; *see also United States v. Richardson,* 588 F.2d 1235, 1241 (9th Cir. 1978) (that two conspiracy counts alleged the same overt acts and identical co-conspirators did not establish the same conspiracy as a matter of law), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979); *but see United States v. Bryan,* 896 F.2d 68, 71–72 (5th Cir.1990) ("A mere shuffling of personnel in an otherwise on-going operation with an apparent continuity will not, alone suffice to create multiple conspiracies."). Further-

---

*v. Guzman,* 852 F.2d 1117, 1119 (9th Cir.1988). To prevail, they must show, based on the record before us, that the two conspiracies are "indistinguishable in law and fact." *Id.* at 1120. Moreover, if plain error analysis applies, the appellants must show error that is "obvious" or otherwise plainly affects the fairness or integrity of the judicial process. *See United States v. Atkinson,*

297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); Fed.R.Crim.P. 52(b); *see also United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir. 1986). Thus, even if plain error analysis applies, it appears that the appellants, rather than the government, pay the price for the inadequacy of the record.

more, the appellants concede that all the overt acts in the Hawaii indictment relate to specific acts committed by the Hawaiian defendants, or to counseling provided by the appellants to the Hawaiian defendants. Thus, there was no overlap between the overt acts charged in the two indictments. Finally, although the appellants were convicted in North Dakota under 18 U.S.C. § 371, the same statute under which they were convicted in Hawaii, the goal of each conspiracy was different. *See Guzman,* 852 F.2d at 1121. The Hawaii indictment alleged a conspiracy to impede the administration of justice in violation of 18 U.S.C. § 1503. The North Dakota indictment apparently did not include that charge.

In conclusion, the fact that the appellants have been convicted of one conspiracy arising out of their dissemination of the redemption material does not mean that they cannot have participated in a separate agreement at substantially the same time, with some of the same people, to commit similar acts. *See Kotteakos v. United States,* 328 U.S. 750, 754–55, 66 S.Ct. 1239, 1242, 90 L.Ed. 1557 (1946); *see also United States v. Arbelaez,* 719 F.2d 1453, 1458 (9th Cir.1983), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). Moreover, there is "nothing to suggest that the success of one [agreement] was in any way dependent upon or related to the other." *United States v. Papa,* 533 F.2d 815, 821–22 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). Therefore, viewing the evidence in the light most favorable to the prosecution, we hold that the appellants have failed to show that the two conspiracies were the same in law and in fact. The appellants certainly have not shown plain error.

## IX

■ Although appellant Porter was also convicted of conspiracy in North Dakota, he does not join the double jeopardy claim raised on appeal by Elvick and Knutt. Instead, Porter claims that the evidence was insufficient to show that he agreed to commit the offense.

■ Porter correctly notes that the essence of the crime of conspiracy is a "meeting of the minds" among the conspirators to accomplish an illegal objective. *See Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Therefore, where two defendants act in concert to achieve a different goal, the government has not shown a meeting of the minds as to a common scheme or plan. *See United States v. Rosenblatt,* 554 F.2d 36 (2d Cir.1977); *see also United States v. Krasovich,* 819 F.2d 253 (9th Cir.1987).

Porter admits that he may have wanted to commit offenses against the United States generally, but contends that the government has not proven that he specifically agreed to commit these crimes in Hawaii. Instead, he portrays himself as a national organizer of the redemption scheme who taught various individuals the method but who could not have been expected to know the exact ways in which his students would use the procedure.

Viewing the evidence in the light most favorable to the prosecution, *see Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), Porter's claim cannot prevail. The government presented evidence that Porter knew, at a minimum, of Brown's foreclosure problems and another defendant's condemnation dispute. Porter explained to them how to put the redemption scheme into effect in response to those problems and who to use the false documents against, including Judge Ezra and members of the U.S. Attorney's Office. This evidence demonstrates not only that Porter was aware of the conspiracy but that he knew of, and helped pursue, its two goals—the filing of the false documents with the IRS and impeding the administration of justice. A rational finder of fact could find beyond a reasonable doubt that Porter conspired with the Hawaiian defendants.

## X

■ The district court added thirteen points to Porter's base offense level because his co-conspirators falsely claimed approximately $4.9 million dollars in tax refunds. Porter claims that increase was in error. We review de novo the district court's application

of the Sentencing Guidelines, *United States v. Kohl,* 963 F.2d 268, 270 (9th Cir.1992), but review the court's factual findings for clear error. *United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992).

■ The court determined Porter's base offense level under U.S.S.G. § 2F1.1. That provision of the Guidelines directs that the base offense level for crimes involving fraud or deceit begins at 6 and is to be increased 13 levels if the loss exceeds $2.5 million. Under the Guidelines, Porter is responsible for the reasonably foreseeable conduct of his co-conspirators in furtherance of the execution of their jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)(B). The court is entitled to rely on information presented against Porter's co-defendants in order to calculate loss. *See United States v. Notrangelo,* 909 F.2d 363, 364–66 (9th Cir.1990).

■ This court has rejected the contention that "loss" under section 2F1.1 means only actual loss. *United States v. Joetzki,* 952 F.2d 1090, 1096 (9th Cir.1991). Rather, to base an upward adjustment on a "loss," the government need only show, by a preponderance of the evidence, the amount of the intended loss. *Id.; see also United States v. Koenig,* 952 F.2d 267, 271–72 (9th Cir.1991). Moreover, the amount of loss that the conspirators intended to inflict does not have to be realistic, *Koenig,* 952 F.2d at 271; nor does the fact that the instrument was "obviously fraudulent" reduce the amount of loss calculated under section 2F1.1. *Joetzki,* 952 F.2d at 1096–97.

As tax returns in the record show that the refunds claimed by the Hawaiian defendants totalled $4,954,751.69, Porter has not shown that the district court clearly erred in finding that the intended loss exceeded $2.5 million; thus, the district court properly increased his base offense level by 13.

AFFIRMED.

