**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ramon HERNANDEZ–GUARDADO, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Dario Jimenez–Frias, Defendant–Appellant.**

**Nos. 99–10342, 99–10480.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 10, 2000[1]

Filed Sept. 7, 2000

---

1. Pursuant to Appellant Ramon Hernandez–Guardado's motion, the panel unanimously finds his appeal, No. 99–10342, suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Michael W. Braa, Sr., Wild, Carter & Tipton, Fresno, California; Joan Jacobs Levie, Fresno, California, for the defendants-appellants.

Stanley A. Boone, Assistant United States Attorney, Fresno, California, for the plaintiff-appellee.

Before: ALARCON, O'SCANNLAIN, and GOULD, Circuit Judges.

ALARCON, Circuit Judge:

We must decide whether a person who knowingly transports an illegal alien in the United States but does so in the course of his employment lacks the mens rea necessary to support a conviction for transportation of an illegal alien. Ramon Hernandez–Guardado ("Hernandez–Guardado") and his codefendant, Dario Jimenez–Frias ("Jimenez–Frias"), appeal from convictions imposed after jury trial for transporting an illegal alien and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (A)(v)(II), and conspiracy to transport illegal aliens, in violation of § 1324(a)(1)(A)(v)(I). Jimenez–Frias also appeals the district court's decision to enhance his sentence pursuant to § 2L1.1(b)(5) of the U.S. Sentencing Guidelines Manual for recklessly creating

a substantial risk of death or serious bodily injury to another.

We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Because we hold that the evidence at trial supported a finding of a direct and substantial relationship between appellants' actions and the furtherance of aliens' illegal presence in the United States, we affirm their convictions. We also conclude that Jimenez–Frias's sentencing enhancement was supported by evidence presented at trial and did not result in a sentence in excess of that authorized by the jury's verdict.

I

On February 19, 1998, Hernandez–Guardado and Jimenez–Frias were charged in a nine-count superseding indictment with conspiring to transport illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). Hernandez–Guardado was also charged with seven counts of transporting an illegal alien on or about October 5, 1997, and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (A)(v)(II). In addition to the conspiracy charge, Jimenez–Frias was charged with one count of transporting an illegal alien, Nicanor Soto–Guzman, on or about May 2, 1997, and aiding and abetting.

Hernandez–Guardado and Jimenez–Frias were tried jointly. On November 20, 1998, the first trial ended in a mistrial after the district court found the jury was deadlocked. Neither defendant objected to the declaration of a mistrial.

The second trial began on February 23, 1999. At the second trial, the first witness to testify for the prosecution was Raymond Greenlee, a supervisory special agent with the anti-smuggling unit of the Immigration and Naturalization Service ("INS"). Agent Greenlee testified that Miguel Reyes approached the INS in February 1997 regarding what Reyes believed to be the illegal activities of his employer at the time, Roberto Davila. Reyes provided the INS with information regarding Davila's

involvement in an illegal alien smuggling and transportation organization based in Los Angeles, California. Reyes agreed to become a confidential informant for the INS.

Agent Greenlee testified that, in May 1997, Reyes provided him with the name of Nicanor Soto–Guzman as a potential witness. Agent Greenlee testified that he tracked down Soto–Guzman, who had returned to Mexico, and interviewed him over the telephone. Agent Greenlee testified that, after Soto–Guzman told him that he believed he could identify the drivers of a van that carried him and sixteen other aliens on a trip from Los Angeles to Yuba City, California, the INS arranged for Soto–Guzman's lawful return to the United States. The INS conducted two photo lineups in which Soto–Guzman identified Jimenez–Frias as the person who picked him up in a van in San Diego and Jesus Castro–Perez[2] as the driver who transported him and sixteen other aliens to Yuba City.

Agent Greenlee testified that, in response to a tip from Reyes, he and a team of California Highway Patrol officers and INS agents were dispatched on October 4, 1997, to set up a surveillance post on Interstate 5 near Santa Nella, California. Shortly after midnight on October 5, 1997, the team stopped a white Ford van with a sign on the driver's side that read, "All America Express." Castro–Perez was driving the van and Hernandez–Guardado was in the front passenger seat. In the back of the van the officers discovered one child, one documented alien, and what the officers later determined to be seven illegal aliens.

Agent Greenlee testified that he interviewed Hernandez–Guardado shortly after he was arrested and had waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). During Agent Greenlee's testimony, the Government introduced the sworn statement

---

**2.** Although Castro–Perez was initially charged in this case, he entered a guilty plea pursuant to a plea agreement with the Government and testified as a prosecution witness at trial.

he took from Hernandez–Guardado that night. In the statement, Hernandez–Guardado admitted that his employer, All America Express, transported aliens from Mexico, El Salvador, Guatemala, and Honduras who had already arrived in cities like San Diego and Phoenix on to other destinations within the United States. He also admitted in the statement that he believed seven of the aliens he transported that night were in the United States illegally.

Reyes also testified at the trial. He explained how he became a confidential informant for the INS in February 1997, while working for Davila. He told the jury that, when he started working for All America Express in April 1997, his duties initially involved bookkeeping, answering the telephone, and other administrative tasks. He said that his duties later included driving for the company, as well.

Reyes testified that Jimenez–Frias owned All America Express and that Hernandez–Guardado worked for the company. Reyes told the jury that smugglers would bring illegal aliens to the office of All America Express to arrange transportation to destinations within the United States. He explained that "[t]he way the office operated, a smuggler ... would bring [three to five] people in, looking for ... either Mr. Jimenez or Mr. Hernandez. In turn when they would return, they would direct me to put their names on the [passenger manifest] and contact the parties that were supposed to pay for their trip at their destination." Jimenez–Frias and Hernandez–Guardado handled all payments and the payments were "strictly cash."

Reyes also described for the jury a number of instances from May 1997 through September 1997 where he, Jimenez–Frias, Hernandez–Guardado, and Castro–Perez paired up with one another to drive van loads of illegal aliens to destinations within the United States. He testified that All America Express used three vehicles on these trips: a seven-passenger gray Dodge Caravan, a fifteen-passenger red 1996 Ford van, and a fifteen-passenger white 1996 Ford van.

Castro–Perez also testified at trial. He testified that Jimenez–Frias owned All America Express. He also admitted that he was a driver for the company. He told the jury that Jimenez–Frias or Hernandez–Guardado would "beep" him when they wanted him to "do a trip." His testimony corroborated Reyes's testimony about trips occurring on May 2, 1997, May 12, 1997, and October 5, 1997.

Roberto Davila testified that he met Jimenez–Frias in early 1996. He told the jury that Jimenez–Frias "would buy people from the smugglers that brought them across the border and would sell them to different people for the highest price. And then we would take them to their destination." Davila further testified that, if Jimenez–Frias had enough passengers, he would load them onto an All America Express van, assign a driver or drivers, and send them on their way. If Jimenez–Frias did not have enough passengers to fill a van, Davila explained, he would "sell" the passengers he had to others. When Davila acquired passengers from Jimenez–Frias, Jimenez–Frias instructed him to drive "later in the evening hours so that [he] could avoid INS inspections or people that could see inside the vehicle."

Soto–Guzman's testimony at trial corroborated Reyes' and Castro–Perez's testimony regarding the May 2, 1997, trip to Yuba City. He testified that he crossed the border from Mexico into the United States in late April 1997. After walking roughly 40 hours, he was taken in a vehicle to a house in San Diego. He was transported in the trunk of a car from that house to a house in Los Angeles where there were roughly 60 other people. He was then taken in a minivan to a "market area," which was where he saw Jimenez–Frias. He stated that Jimenez–Frias told him to climb "quickly" into a red Ford van. Soto–Guzman and 16 other passengers were transported to Yuba City in that van.

At the close of all evidence on February 25, 1999, neither Hernandez–Guardado nor

Jimenez–Frias moved for an acquittal for insufficiency of the evidence under Rule 29 of the Federal Rules of Criminal Procedure. Later that day, each man was convicted by the jury of all the charges against him. Neither filed a post-verdict motion for a judgment of acquittal.

On June 21, 1999, the district court sentenced Hernandez–Guardado to 46 months of imprisonment.

Jimenez–Frias objected to a recommendation in the presentence report that the district court increase his offense level by two levels for intentionally or recklessly creating a substantial risk of death or serious bodily injury to another in the course of the unlawful transportation conspiracy. At Jimenez–Frias's September 20, 1999, sentencing hearing, the district court adopted the findings and recommendation of the presentence report in support of the enhancement. The district court sentenced Jimenez–Frias to 51 months of imprisonment.

Both men filed timely notices of appeal.

## II

■■■■ Appellants argue that the evidence at trial did not support a reasonable conclusion that they had the mens rea necessary to support their convictions for transporting an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). We will conclude that there is sufficient evidence to support a conviction if, " 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *See United States v. Deeb*, 175 F.3d 1163, 1168 (9th Cir.1999) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). Because neither appellant in this case made or renewed an earlier motion for an acquittal at the close of all evidence, we review only for plain error and to prevent a miscarriage of jus-

tice. *See United States v. Yossunthorn*, 167 F.3d 1267, 1270 n. 4 (9th Cir.1999); *United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1009–10 (9th Cir.1995).

The statute under which appellants were charged and convicted of transporting illegal aliens provides for the imposition of criminal sanctions on any person who:

> knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

8 U.S.C. § 1324(a)(1)(A)(ii). We have recognized that a conviction under this section requires more than just the defendant's knowledge or reckless disregard of the fact that the alien transported was illegally present in the United States: the Government must also prove that the defendant " 'intended to further the alien's illegal presence in the United States.' " *United States v. Hernandez–Franco*, 189 F.3d 1151, 1155 (9th Cir.1999) (quoting *United States v. Barajas–Montiel*, 185 F.3d 947, 954 (9th Cir.1999)).

■■■■ Hernandez–Guardado concedes in his brief to this court that "there is substantial evidence that [he] did, in fact, transport illegal aliens, and ... substantial evidence exists that [he] knew that his charges were illegal aliens." Hernandez–Guardado argues that the evidence was nevertheless insufficient because it showed that he transported illegal aliens in the course of his employment and therefore could not support the conclusion that he had the intent to further their illegal presence. In his brief, Jimenez–Frias informs this court that he "hereby joins the argument presented in the appeal of his codefendant." In support of the argument, Jimenez–Frias asserts that "[h]e wanted only to earn a living."[3]

---

**3.** Jimenez–Frias also asserts that "[h]e had previously been found innocent of the same charges in Yakima, Washington and had every reason to believe he was innocent here."

Jimenez–Frias' belief that his conduct was lawful is irrelevant to whether the evidence supported the finding that he intended to fur-

As support for appellants' position that they lacked the intent to further their passengers' illegal presence in the United States, they rely on our decision in *United States v. Moreno*, 561 F.2d 1321 (9th Cir. 1977). In *Moreno*, Encarnacion Moreno, a foreman for a reforestation company, was required to transport workers from one job site to another. *Id.* at 1322. There was substantial evidence to support the finding that Moreno knew that some of the workers he transported were illegal aliens. *See id.* After being stopped by immigration officials and subsequently arrested, Moreno was convicted on three counts of transporting illegal aliens.[4] *See id.* We reversed Moreno's conviction, reasoning that

> Mr. Moreno was transporting the aliens as part of the ordinary and required course of his employment as a foreman. As such, his transportation of the aliens was only incidentally connected to the furtherance of the violation of law, if at all. It was too attenuated to come within the boundaries of [8 U.S.C.] § 1324(a)(2).

*Id.; see also United States v. One 1984 Ford Van*, 826 F.2d 918, 919–20 (9th Cir. 1987) (citing *Moreno* as controlling authority and reversing a conviction under § 1324(a)(2) on facts analogous to those in *Moreno* ).

▮▮▮▮ The Government need not prove by direct evidence a defendant's intent to further the presence of an illegal alien. *See United States v. Beltran–Garcia*, 179 F.3d 1200, 1205 n. 4 (9th Cir.1999) (noting that it is permissible for a factfinder to infer that a person intends the natural and probable consequences of his actions).

Moreover, we have stated that even "[d]uress does not negate the mens rea required for a violation of section 1324(a)(1)(A)(ii). Appellant could intend to drive a truck with undocumented aliens to further their illegal presence in the United States, but act in that manner because someone had a gun to his head." *Hernandez–Franco*, 189 F.3d at 1158. We made clear in *Moreno* that our decision in that case did not mean that those who transport illegal aliens in the course of their employment are immune from liability for that conduct due to a lack of the requisite mens rea:

> We do not imply that there is an *ipso facto* exemption for those who transport undocumented aliens for employment or as an incident to employment.

> We merely state that where the transportation of such an alien occurs, there must be a direct or substantial relationship between that transportation and its furtherance of the alien's presence in the United States. *Moreno*, 561 F.2d at 1323 (citation omitted).

In *United States v. Gonzalez–Hernandez*, 534 F.2d 1353 (9th Cir.1976), the facts to which the parties had stipulated were that "aliens had crossed the border from Mexico without inspection or detection, [and] then were driven from California to Washington by appellant," that the aliens paid the appellant for transporting them, and that the appellant knew his passengers were in the United States illegally. *Id.* Without expressly addressing the mens rea element of the offense, we affirmed the appellant's conviction for transporting illegal aliens. *Id.* at 1354. We distinguished

---

ther the illegal presence of aliens in the United States. *See United States v. Pasillas–Gaytan*, 192 F.3d 864, 867 (9th Cir.1999) ("The general rule in the criminal law is that the defendant does not have to know that his conduct is illegal; hence the expression that 'ignorance of the law is no excuse.' ") (citing *Lambert v. People of California*, 355 U.S. 225, 228, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957)).

4. The appellant in *Moreno* was convicted under the predecessor to 8 U.S.C.

§ 1324(a)(1)(A)(ii), which provided for criminal sanctions for " '[a]ny person ... who ... knowing that [an alien] is in the United States in violation of law ... transports, or moves, or attempts to transport or move [said alien] within the United States by means of transportation or otherwise, *in furtherance of such violation of law*.' " *Moreno*, 561 F.2d at 1322 n. 1 (quoting 8 U.S.C. § 1324(a)(2) (1976) (emphasis added)).

*Gonzalez–Hernandez* in *Moreno* on the basis that the appellant's "relationship to the actual illegal entrance seemed much more direct and substantial as to time, place, distance and overall impact than does the case before us." *Moreno*, 561 F.2d at 1323.

Here, the evidence supported a reasonable conclusion that, much like the appellant in *Gonzalez–Hernandez*, Hernandez–Guardado and Jimenez–Frias provided transportation for one leg of illegal aliens' migration to locations within the United States. We hold today that such conduct has a direct and substantial relationship to the furtherance of the aliens' illegal presence in the United States. Appellants' argument that the evidence was insufficient to support their convictions under 8 U.S.C. § 1324(a)(1)(A)(ii) therefore·fails.

### III

Jimenez–Frias also contends that the district court erred in applying a two-level enhancement to his offense level. Guideline § 2L1.1(b)(5) applies to offenses of "Smuggling, Transporting, or Harboring an Unlawful Alien" and provides, in pertinent part, that "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels." U.S. Sentencing Guidelines Manual § 2L1.1(b)(5) (1998). The application notes to § 2L1.1 provide that

> [r]eckless conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (*e.g.,* transporting persons in the trunk or engine compartment of a motor vehicle, *carrying substantially more passengers than the rated capacity of a motor vehicle* or vessel, or harboring persons in a crowded, dangerous, or inhumane condition).

*Id.* at commentary at n. 6 (second emphasis added).

The presentence report included the following discussion and recommendation in support of the two-level enhancement:

Pursuant to USSG § 2L1.1(b)(5), if the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels. Trial testimony reflects on May 2, 1997, the defendant, Dario Jimenez–Frias, transported 17 unlawful aliens plus a driver and a passenger (a smuggler, for a total of 19) from Los Angeles to Yuba City, California, in a 15–person van. Further, on May 12, 1997, Jimenez–Frias instructed [Reyes, the confidential informant,] and co-conspirator Jesus Castro–Perez to drive 7 unlawful aliens (for a total of 9 persons) from Los Angeles to Denver, Colorado, and Chicago, Illinois, in a seven-passenger van. On May 23, 1997, Castro–Perez also transported 15 individuals plus another driver (for a total of 17 persons) from Los Angeles to New York in a 15–passenger van. The case agent advised this officer that during the course of the conspiracy, several passengers sat on benches which did not have seatbelts and others lay on the floorboard of the van during their journey. Taking into consideration the aforementioned testimony, a 2–level enhancement is recommended as it is believed the offense involved intentionally or recklessly creat[ing] a substantial risk of death and serious bodily injury to another during the conspiracy.

At Jimenez–Frias's September 20, 1999, sentencing hearing, the district court adopted the findings of fact included in the presentence report. The district court adopted the recommendation that Jimenez–Frias's offense level be increased by two levels under § 2L1.1(b)(5).

### A

■ Jimenez–Frias first argues that the imposition of the sentencing enhancement violated his Fifth and Sixth Amendment rights because the facts necessary to support the enhancement were not charged in the indictment and proven to the jury beyond a reasonable doubt. As support for this argument, Jimenez–Frias relies on the Supreme Court's recent decisions in *Jones*

*v. United States,* 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999), and *Apprendi v. New Jersey,* —— U.S. ——, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Jones,* Nathaniel Jones was charged in a two-count indictment with one count of carjacking, in violation of 18 U.S.C. § 2119. *See id.* at 230, 119 S.Ct. 1215. That statute then provided that

> [w]hoever, possessing a firearm as defined in section 921 of this title, takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so, shall
>
> (1) be fined under this title or imprisoned not more than 15 years, or both,
>
> (2) if serious bodily injury (as defined in section 1365 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> (3) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

18 U.S.C. § 2119 (Supp. V 1988).

The indictment made no reference to the numbered subsections of § 2119 and charged none of the facts mentioned in the second or third subsections. *See id.* at 230–31, 119 S.Ct. 1215. A jury convicted Jones of both counts of the indictment. *See id.* at 231, 119 S.Ct. 1215. The presentence report recommended a sentence of 25 years on the carjacking count because one of the carjacking victims allegedly suffered serious bodily injury. *See id.*

Jones objected to the imposition of a 25-year sentence, arguing that serious bodily injury was an element of the offense defined in part by § 2119(2), an element that was neither charged in the indictment nor proven to the jury beyond a reasonable doubt.[5] *See id.* The district court rejected this argument and, after finding the allegation of serious bodily injury in the presentence report was supported by a preponderance of the evidence, sentenced Jones to serve 25 years in prison on the carjacking count. *See id.* This court affirmed, holding that § 2119(2) was not an element of Jones's offense but rather a sentencing factor that need only be proven to the sentencing judge by a preponderance of the evidence. *See id.* at 231–32, 119 S.Ct. 1215.

The Supreme Court reversed and remanded, holding that § 2119(2) was not merely a sentencing factor but was instead an element of Jones's offense and accordingly had to be charged in the indictment and proven to the jury beyond a reasonable doubt. *See id.* at 251–52, 119 S.Ct. 1215. The Court reasoned that, in so holding, it avoided a serious constitutional question because "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *See id.* at 243 n. 6, 119 S.Ct. 1215; *see also id.* at 239–40, 119 S.Ct. 1215 (discussing the constitutional doubt doctrine).

---

**5.** In an effort to analogize his case to *Jones,* Jimenez–Frias points to a subsection of 8 U.S.C. § 1324 under which he was not charged, convicted or sentenced. That subsection provides that, "in the case of a violation of [§ 1324(a)(1)(A)(ii)] during and in relation to which the person causes serious bodily injury ... to, or *places in jeopardy the life of, any person,* [the convicted person shall be] imprisoned not more than 20 years." § 1324(a)(1)(B)(iii) (emphasis added). The mere existence of this statutory subsection has no bearing on whether the district court unconstitutionally enhanced Jimenez–Frias's sentence pursuant to Guideline § 2L1.1(b)(5)

for the similar, but not identical, conduct of "intentionally or recklessly *creating a substantial risk of death or serious bodily injury* to another person." *Cf. Bailey v. United States,* 516 U.S. 137, 150, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (noting that a defendant convicted of a drug trafficking offense may have his sentence enhanced pursuant to Guideline § 2D1.1(b)(1) for possessing a firearm even if he is not charged and convicted under 18 U.S.C. § 924(c)(1), which mandates a five-year minimum term for one who "during and in relation to any ... drug trafficking crime ... uses or carries a firearm").

In *Apprendi*, the Court reached the constitutional question it stopped short of deciding in *Jones*. The Court considered the case of Charles Apprendi, who was arrested on suspicion that he had fired several shots into the home of an African–American family that had recently moved into a previously all-white neighborhood. *Apprendi*, —— U.S. at ——, 120 S.Ct. at 2351. Apprendi admitted that he fired the shots and also explained to a police officer that " 'because [the victims] are black in color he does not want them in the neighborhood.' " *Id.* (quoting *New Jersey v. Apprendi*, 159 N.J. 7, 731 A.2d 485, 486 (1999)). He subsequently retracted the latter statement. *See id.*

Apprendi pled guilty to three counts of a 23–count indictment, including count 18. *See id.* at 2352. Count 18 of the indictment charged Apprendi with second degree possession of a firearm for an unlawful purpose. *See id.* The indictment made no mention of the state "hate crime" statute. *See Apprendi*, —— U.S. at ——, 120 S.Ct. at 2352. As part of the plea agreement, however, the State reserved the right to seek a sentencing enhancement under the statute and Apprendi reserved the right to challenge the constitutionality of the enhancement. *See id.* The state "hate crime" statute provided for the imposition of "an extended term if [the trial court] finds, by a preponderance of the evidence," that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity." N.J. Stat. Ann. 2C:44–3(e). The "extended term" for a second degree offense was "between 10 and 20 years." N.J. Stat. Ann. 2C:43–7(a)(3).

At the plea hearing, the trial court heard sufficient evidence to establish Apprendi's guilt on count 18. *See id.* Under the terms of the statute under which Apprendi was convicted, the maximum sentence for count 18 was ten years of imprisonment. *See id.* After holding an evidentiary hearing, however, the trial court credited the testimony of the police officer and found by a preponderance of the evidence that the hate crime enhancement applied to Apprendi's sentence. *See id.* The trial court sentenced Apprendi to twelve years' imprisonment for count 18. *See id.* On appeal, the New Jersey Supreme Court affirmed. *See id.* at 2353.

As framed by the U.S. Supreme Court in *Apprendi*, "[t]he constitutional question [was] whether the 12–year sentence imposed on count 18 was permissible, given that it was above the 10–year maximum for the offense charged in that count." *Id.* at 2354. The Court answered that question in the negative and reversed and remanded. *Id.* at 2366–67. The Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362–63.

Here, Jimenez–Frias was convicted by the jury of one count of transporting an illegal alien and aiding and abetting, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (A)(v)(II). He was also convicted of one count of conspiracy to transport illegal aliens, in violation of § 1324(a)(1)(A)(v)(I). It is clear from the presentence report, which stated that "a 2–level enhancement is recommended as it is believed the offense involved intentionally or recklessly creat[ing] a substantial risk of death and serious bodily injury to another during the conspiracy," that the § 2L1.1(b)(5) enhancement imposed by the district court related to Jimenez–Frias's conspiracy conviction.

The maximum penalty for the conspiracy conviction was ten years of imprisonment. *See* § 1324(a)(1)(B)(i). The presentence report grouped the counts of conviction together under Guideline § 3D1.2(d)[6] and calculated that Jimenez–

---

**6.** Guideline § 3D1.2(d) provides that

All counts involving substantially the same

Frias's sentencing range was 51 to 63 months of imprisonment. The district court sentenced Jimenez–Frias to a single 51–month term of imprisonment.

The two-level enhancement under § 2L1.1(b)(5) did not result in a sentence that exceeded the ten-year statutory maximum for Jimenez–Frias's conspiracy conviction. Because the finding that Jimenez–Frias intentionally or recklessly created a substantial risk of death or serious injury to another person did not "expose the defendant to a greater punishment than that authorized by the jury's guilty verdict," *Apprendi,* 120 S.Ct. at 2365, Jimenez–Frias's case does not implicate the rule in *Apprendi.* The argument that the district court violated Jimenez–Frias's Fifth and Sixth Amendment rights in imposing the § 2L1.1(b)(5) enhancement therefore fails.

## B

■ Jimenez–Frias next argues that the district court erred in concluding that Guideline § 2L1.1(b)(5) applied to his offense conduct. "The district court's application of the Guidelines to the facts of a particular case is reviewed for an abuse of discretion." *United States v. Frega,* 179 F.3d 793, 811 n. 22 (9th Cir.1999), *cert. denied,* — U.S. ——, 120 S.Ct. 1247, 146 L.Ed.2d 105 (2000). "The district court's factual findings in the sentencing phase are reviewed for clear error." *Id.* " 'Review under the clearly erroneous standard is significantly deferential .... [and] does not entitle a reviewing court to reverse the findings of the trial court simply because the reviewing court might have decided differently.' " *United States v. Palafox–Mazon,* 198 F.3d 1182, 1186 (9th Cir.2000)

(quoting *United States v. Asagba,* 77 F.3d 324, 326 (9th Cir.1996)).

■ The district court is entitled to adopt the fact findings of the presentence report if, as is true here, they are supported by the record. *See United States v. Williams,* 41 F.3d 496, 499 (9th Cir. 1994). At trial, Reyes described each of the vans used by All America Express and testified regarding their passenger capacity. Reyes also testified that on May 2, 1997, 17 passengers, driver Castro–Perez, and one other individual rode in a 15–passenger van from Los Angeles to Yuba City. The Government also introduced the All America Express passenger manifest for that trip and the testimony of passenger Soto–Guzman, both of which corroborated Reyes's testimony. Reyes also testified that on May 12, 1997, at Jimenez–Frias's request, he drove himself and eight other people in a seven-passenger van from Los Angeles to Denver, Colorado, en route to Chicago, Illinois.

Also appearing in the record was a passenger manifest for a May 23, 1997, trip to New York that listed 15 passengers and two drivers. The manifest indicated that the assigned van was a "blanca" 1996 Ford, which Reyes had testified had a 15–passenger capacity. Reyes also testified that he and Jimenez–Frias together transported six others in a seven-passenger van on a trip from Modesto, California, to Yakima, Washington, on September 12, 1997. Finally, Agent Greenlee testified at trial that, on stopping an All America Express van on October 5, 1997, he and his fellow law enforcement officers found the passengers were not strapped into seats with seatbelts but were instead lying unre-

harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule....
(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the

offense guideline is written to cover such behavior.
Offenses covered by the following guidelines are to be grouped under this subsection:

§ 2L1.1

U.S. Sentencing Guidelines Manual § 3D1.2(d) (1998).

strained on floorboards and across the seats.

Reasonable minds could differ as to the severity of the overcrowding in the vans and the resulting degree of risk. The district court, however, did not clearly err in finding the All America Express vans were overcrowded on numerous occasions or in determining that, in permitting such conditions to exist, Jimenez–Frias recklessly created a substantial risk of death or serious bodily injury to another. We therefore conclude the district court did not abuse its discretion in concluding that Jimenez–Frias's offense conduct warranted a two-level enhancement under § 2L1.1(b)(5).

## IV

■ Jimenez–Frias next contends that the district court prematurely excused the jury and declared a mistrial at the first trial. He argues that the second trial therefore violated his Fifth Amendment right against double jeopardy. It is undisputed that Jimenez–Frias failed to raise this claim before the district court.

Under the Federal Rules of Criminal Procedure, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b). Both parties agree, however, that the case law in this circuit reflects some uncertainty as to whether a double jeopardy claim not raised in the district court is subject to plain error review under Rule 52(b). *Compare United States v. Freeman*, 6 F.3d 586, 600–01 (9th Cir.1993) ("Despite the fact that Freeman failed to raise this issue [of double jeopardy] before the district court, he has not waived it. As a result of his failure, however, we will employ a plain error standard of review.") (citation omitted), *with United States v. Lorenzo*, 995 F.2d 1448, 1457 (9th Cir. 1993) ("Failure to present a double jeopardy challenge constitutes a waiver of that claim.... It is not clear whether we can review for plain error a double jeopardy claim that has been waived."); *see also United States v. Kearns*, 61 F.3d 1422,

1427–28 (9th Cir.1995) ("It is unclear whether we can review Kearns' double jeopardy claim for plain error. We need not decide whether plain error analysis applies, however, because, even assuming that it does, we reject Kearns' double jeopardy claim.") (citation and footnote omitted).

In *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993), the Supreme Court noted that the distinction between waiver and forfeiture of a constitutional claim is of consequence in the context of Rule 52(b), which "defines a single category of forfeited-but-reversible error." *Id.* at 732, 113 S.Ct. 1770. The Court explained that, "[w]hereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.... Mere forfeiture, as opposed to waiver, does not extinguish an 'error' under Rule 52(b)." *Id.* at 733, 113 S.Ct. 1770 (citations and quotations omitted). The Court further noted that, "[i]f a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an 'error' within the meaning of Rule 52(b) despite the absence of a timely objection." *Id.* at 733–34, 113 S.Ct. 1770.

■ The right against double jeopardy is undoubtedly subject to waiver by a defendant. *See Lorenzo*, 995 F.2d at 1457 (citing *United States v. Broce*, 488 U.S. 563, 568–69, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989)). In the context of a plea bargain or guilty plea, for example, a defendant may intelligently and voluntarily waive his right against double jeopardy. *See Broce*, 488 U.S. at 575–76, 109 S.Ct. 757 (holding that a voluntary and intelligent guilty plea is not subject to collateral attack on appeal); *Ricketts v. Adamson*, 483 U.S. 1, 11, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (concluding that the right against double jeopardy is not implicated where the defendant enters into a plea bargain). In this case, however, Jimenez–Frias failed to raise a double jeopardy claim before the district

court but took no affirmative steps to relinquish his right against double jeopardy. Four circuits have concluded in similar circumstances that a failure to assert double jeopardy before the district court was a forfeiture of that right, not a waiver. *See United States v. Branham,* 97 F.3d 835, 842 (6th Cir.1996); *United States v. Penny,* 60 F.3d 1257, 1261 (7th Cir.1995); *United States v. Jarvis,* 7 F.3d 404, 409–10 (4th Cir.1993); *United States v. Rivera,* 872 F.2d 507, 509 (1st Cir.1989). Absent evidence of a voluntary and intelligent relinquishment by Jimenez–Frias of his right against double jeopardy, his failure to object constituted a forfeiture rather than a waiver of his double jeopardy claim. We may therefore review it for plain error.

▆ A district court may declare a mistrial and retry a defendant without violating the prohibition against double jeopardy when there is a manifest necessity for the discharge of the original proceeding. *See Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). A hung jury is the classic example of manifest necessity. *See Washington,* 434 U.S. at 509, 98 S.Ct. 824; *see also Richardson v. United States,* 468 U.S. 317, 326, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984) ("[A] trial court's declaration of a mistrial following a hung jury is not an event that terminates the original jeopardy to which petitioner was subjected."). "The trial judge's decision to declare a mistrial when he considers the jury deadlocked is … accorded great deference by a reviewing court." *Washington,* 434 U.S. at 510, 98 S.Ct. 824.

▆ In determining whether to declare a mistrial because of jury deadlock, relevant factors for the district court to consider include the jury's collective opinion that it cannot agree, the length of the trial and complexity of the issues, the length of time the jury has deliberated, whether the defendant has objected to a mistrial, and the effects of exhaustion or coercion on the jury. *See United States v. Cawley,* 630 F.2d 1345, 1348–49 (9th Cir. 1980). "The most critical factor is the

jury's own statement that it is unable to reach a verdict." *Id.* at 1349. Without more, however, such a statement is insufficient to support a declaration of a mistrial. *See id.* On receiving word from the jury that it cannot reach a verdict, the district court must question the jury to determine independently whether further deliberations might overcome the deadlock. *See id.* at 1349.

▆ Here, jury deliberations in the first trial began at 2:15 pm on November 20, 1998. At 3:55 pm, the foreperson of the jury wrote the following in a note to the district court: "At this time after deliberation the jury is hung. We have presented the facts of the case to each other and cannot come to a unanimous decision. One juror is steadfast in their convictions and has stated that there is nothing that will change their mind." The district court returned the jury to the courtroom at 4:18 pm and instructed them as follows:

> Ladies and gentleman, your note sounds like you can't reach a verdict in this case. And it sounds so definite that I—I usually ask you to go home and come back and try to do it. But according to the note, it sounds like that would be impossible. And I just want to be sure that you agree that you wouldn't be able to reach a verdict if you came back tomorrow or Monday or Tuesday. Tuesday would be the day.
>
> Let's see a show of hands, how many think that you are not going to reach a verdict with more deliberations? It sounds like you pretty well agree on something. Very well, then, I will excuse you with my thanks for your three days of service. I always hate to do that because we didn't get the job done either way. But anyway, you tried, and I appreciate it. So you are now excused with my thanks.

Although the record does not reflect the number of jurors who raised their hands, we can infer from the court's comment that the jurors "pretty well agree on something" that the jury's collective opinion

was that further deliberation would be futile. Moreover, the record reflects no objection by defense counsel to the court's finding or declaration of a mistrial. We conclude that the district court did not plainly err in subjecting Jimenez–Frias to a second trial after declaring a mistrial in the first.

**AFFIRMED.**