255 F.3d 1054 (9th Cir. 2001)
 UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
JESUS RODRIGUEZ-CRUZ, DEFENDANT-APPELLANT.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
CARLOS JAVIER GUTIERREZ-SANCHEZ, DEFENDANT-APPELLANT.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
LUIS ALBERTO MEZA-ROSARIO, DEFENDANT-APPELLANT.
 No. 00-50351, No. 00-50352, No. 00-50366
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted April 5, 2001--Pasadena, California
Filed July 3, 2001
 
 Knut S. Johnson, San Diego, California, Sylvia Baiz, San Diego, California, and Stephen D. Lemish, El Cajon, California, for the appellants.
 John N. Parmley, Assistant United States Attorney, San Diego, California, for the appellee.
 Appeal from the United States District Court for the Southern District of California Barry T. Moskowitz, District Judge, Presiding. D.C. No. CR-99-01133-001-BTM; D.C. No. CR-99-01133-002-BTM; D.C. No. CR-99-01133-003-BTM
 Before: Procter Hug, Jr., John M. Duhe, Jr.,* and Richard C. Tallman, Circuit Judges.
 
 Hug, Circuit Judge
 I. Introduction
 
 1
 Appellants were employed by alien smugglers to guide illegal immigrants into the United States via the mountains between Mexico and San Diego. They appeal sentences imposed after each pled guilty to alien smuggling resulting in death. The principle issues on appeal are whether sentencing enhancements were properly imposed for (1) recklessly creating a substantial risk of death or serious bodily injury and (2) the death of an alien that resulted. The alien died of hypothermia, suffered during a rare snowstorm that struck during the journey. Appellants argue that smuggling illegal aliens through the mountains was not sufficiently risky to qualify for the offense-level increase and that they were not aware of the unexpected snowstorm. We affirm because Appellants guided aliens who were obviously woefully under-equipped for the potential hazards that were known prior to departure. Once the enhancement was warranted for recklessly creating the risk, it was proper for the district court automatically to impose the additional enhancement for the death that resulted from that risk. We also affirm the district court's denial of a minor role downward adjustment for one appellant and the magnitude of the district court's downward departure from the Guidelines for another appellant.
 
 II. Factual Background
 
 2
 The fateful trip began Wednesday, March 31, 1999. Appellants Jesus Rodriguez-Cruz and Luis Meza-Rosario had agreed to accompany an alien smuggler named "El Pajaro" and assist with a group of about 15 aliens seeking to enter the United States illegally via the mountains between Tecate, Mexico and Interstate 8 in eastern San Diego County. Appellant Carlos Gutierrez-Sanchez was doing the same for a smuggler named Guillermo who had an unrelated group of five aliens. Appellants were to receive two or three hundred dollars for their services.
 
 
 3
 Both Appellants and the aliens began the journey illequipped. Jeans, cotton shirts, and tennis shoes were the clothing of choice. Some had light jackets, windbreakers, or sweatshirts. One of the aliens, Guillermo Gonzalez-Gonzalez, who testified at an evidentiary hearing in the district court, stated that he was not told how long the trip would take and that he brought only two packages of donuts and a liter of water for the journey. He said that Appellants' only advice to the immigrants was to buy and bring a trash bag for protection from the weather, which advice was heeded by some and disregarded by others. The other alien who testified at the evidentiary hearing, Francisco Gutierrez-Diaz, stated that he was told to bring food or water for a maximum of two or three days. He ran out of water on the first day and resorted to collecting water from rivers or creeks that ran through the mountains.
 
 
 4
 After the first day of trekking, El Pajaro's group spent the night in the mountains and built a fire.[1] The next day, El Pajaro's group happened upon Guillermo's group, and the two began to travel together. Gutierrez-Diaz testified that almost everyone ran out of food on the second day. During that afternoon, it rained. And shortly after the rain stopped, a snowstorm rolled in during the early evening.
 
 
 5
 Because of the cold temperatures and the immigrants' wet clothes, some in the group began to have difficulty traveling onward. Appellants assisted those who struggled. Later, Appellants waited for those immigrants that could not continue. Eventually, Appellants continued on, leaving a few of the immigrants behind. Appellants assert that they left with the belief that they would better serve those left behind by pressing on toward the highway and trying to find help. Once they reached the highway, Appellants used an emergency call box to call for help. When the authorities arrived, Appellants pointed them in the direction of those who had been left behind. Appellants even declined an opportunity to leave the scene before help arrived.
 
 
 6
 In response to Appellants' call, by 3:00 a.m. on Friday, April 2, 1999, members of the BORSTAR[2] team were on the trails looking for immigrants who had not made it out of the mountains. BORSTAR agent Watkins testified that the temperature was around freezing and that the storm had dumped at least a foot of snow on the ground. He also testified that the snow obscured the trail and that if he had not been following footprints coming out of the canyon he would have lost the trail as he made his way from the highway into the mountains. Agent Watkins stated that he did not know that San Diego Country could have such conditions, and the government stipulated that the snowstorm was not foreseeable. Eventually, the BORSTAR team succeeded in extricating between 30 and 40 survivors; however, five bodies were found as well. One of the dead was a member of Appellants' group, who had been left behind with his nephew and the nephew's friend.
 
 III. Procedural Background
 
 7
 Appellants all pled guilty to transporting aliens resulting in death in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (A)(v)(II), and (B)(iv). The district court conducted an evidentiary hearing over two days in order to make factual determinations that would be relevant at sentencing. At their joint sentencing, Appellants each began with a base offense level of twelve under United States Sentencing Guideline ("U.S.S.G.") § 2L1.1(a)(2), which was increased three levels under § (b)(2) for the number of aliens being smuggled. At issue in this appeal is the district court's decision to increase Appellants' offense level to 18 under § (b)(5) for recklessly creating a substantial risk of death or serious bodily injury. Also at issue is the additional eight-level increase imposed under§ (b)(6) for the death that resulted from that risk.
 
 
 8
 Appellants argued that their conduct did not create a substantial risk of death or serious bodily injury. Furthermore, because the snowstorm was unforeseeable, Appellants argued that they had not recklessly exposed the aliens to that risk. The government countered that Appellants, who had been through those mountains before, knew that hiking the trails posed a substantial risk of death or serious injury. The government asserted that they undertook that risk--which was not adequately conveyed to the immigrants--because smuggling is a profitable business. The government cited food and water shortages, injuries such as broken ankles, and water-borne parasites as examples of the dangers.
 
 
 9
 After evaluating the testimony from the evidentiary hearing, the district judge concluded that "no one anticipated that snowstorm." Nevertheless, he imposed the offense-level increases essentially for the reasons argued by the government.
 
 
 10
 I find the government has established . . . that the defendants here participated in a venture [in which] they recklessly created a substantial risk of death or serious bodily injury [because of] the lack of food, the lack of clothing, the lack of proper equipment, and coming through a very dangerous and rugged terrain. Even though a lot of aliens do it and a lot of aliens die, bringing people through this area is done because they want to avoid the risk of being caught by any of the other means that they could enter in the other more populated areas. And they were willing to undertake a substantial risk of danger to these people, risk of death or serious bodily injury, by traveling through this area during the early spring ill-equipped and ill-clothed and ill-provided with necessary food and water.
 
 
 11
 I think that if any one of us knew someone who was going to make this trip under the same conditions, wearing a t-shirt, a plastic bag -- perhaps a plastic bag for protection from the rain -- and carrying a package of donuts and a liter of water, we would say, "You are just asking for trouble."
 
 
 12
 That is what they were doing, they were asking for trouble. They knew that there was a substantial risk, but they were willing to take the substantial risk because that would get them into the United States and would result for them in compensation.
 
 
 13
 And under the circumstances, the court believes that 2L1.1(b)(5) has been established . . . . I incorporate all of the findings I made previously during the evidentiary hearing.
 
 
 14
 Later the court stated that the offense-level increase was not because of the snowstorm but, rather, was because of the general lack of preparedness given the known risks.
 
 
 15
 Finally, Appellant Rodriguez-Cruz sought a mitigating role downward adjustment, which was denied. And Appellant Meza-Rosario sought and received a downward departure from the Guidelines; however, he appeals the magnitude of that departure.[3]
 
 IV. Analysis
 
 16
 We review the district court's interpretation of the Sentencing Guidelines de novo. United States v. Dixon , 201 F.3d 1223, 1233 (9th Cir. 2000). The district court's application of the Guidelines to the facts of a particular case is reviewed for an abuse of discretion. United States v. Hernandez-Guardado, 228 F.3d 1017, 1027 (9th Cir. 2000). The district court's factual findings in the sentencing phase are reviewed for clear error. Id.
 
 A. U.S.S.G. § 2L1.1(b)(5)
 
 17
 U.S.S.G. § 2L1.1 is the Guideline for smuggling, transporting, or harboring illegal aliens. It provides:"If the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels, but if the resulting offense level is less than level 18, increase to level 18." U.S. Sentencing Guidelines Manual § 2L1.1(b)(5) (2000). Application Note six explains:
 
 
 18
 Reckless conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition).
 
 
 19
 Id., cmt. n.6. Application Note one to U.S.S.G. § 2A1.4 (Involuntary Manslaughter) provides additional guidance:
 
 
 20
 "Reckless" refers to a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation.
 
 
 21
 Id., § 2A1.4, cmt. n.1. We conclude that U.S.S.G. § 2L1.1(b)(5) encompasses Appellants' conduct of assisting alien smugglers because Appellants were aware of the potential dangerous conditions of the journey but nevertheless proceeded with the trip despite the immigrants' obvious lack of adequate food, water, clothing, and protection from the elements.
 
 
 22
 As explained by the district judge, Appellants saw how the immigrants were dressed and what they had brought in the way of food, water, clothing, and equipment; nevertheless, Appellants agreed to participate in the venture. They could have urged the immigrants to obtain adequate provisions. If the immigrants refused to do so, Appellants could themselves have refused to go. But they did neither. Having been through those mountains before, Appellants knew the conditions and dangers of proceeding so ill-equipped. According to the district court's findings, the mountains rise to an elevation of over 4,000 feet and contain rugged terrain that is riddled with canyons, streams, and other obstacles. Furthermore, the district court noted that the snowstorm was different only in degree from the weather conditions that can occur in early spring in those mountains. The temperature can drop to as low as 36 degrees at night, and there is the potential for rain during that time of year. In addition to possible severe weather, the government correctly pointed out the other dangers of such a journey: lack of food and water, the potential for injury, and the risk of water-borne parasites or disease. The district court's conclusion that Appellants recklessly created the risk of death or serious bodily injury to the immigrants under their charge was not clearly erroneous. Accordingly, the district court did not abuse its discretion by applying § 2L1.1(b)(5) to increase Appellants' offense level to 18.
 
 B. U.S.S.G. § 2L1.1(b)(6)
 
 23
 This court recently rejected the argument made by Meza-Rosario and Gutierrez-Sanchez that additional intent beyond that required for § 2L1.1(b)(5) is required under § (b)(6):
 
 
 24
 Section (b)(5), immediately preceding § (b)(6), specifies that intent or recklessness is required to hold a defendant responsible for creating the risk of death. Section (b)(6)(4) states simply that if death results, an increase is required. The failure to specify that intent is required, immediately following a section that specifies intent, is a clear indication that no intent is necessary for an increase under § (b)(6).
 
 
 25
 United States v. Herrera-Rojas, 243 F.3d 1139, 1144 (9th Cir. 2001). The district court, deciding the issue before our opinion in Herrera-Rojas, correctly reasoned to the same conclusion. Because Appellants were subject to § (b)(5) for recklessly creating the risk, an additional eight-level increase was required by § (b)(6)(4) for the death that resulted from that risk.
 
 C. Minor Role Regarding Rodriguez-Cruz
 
 26
 "Under [U.S.S.G. §] 3B1.2(b), a defendant is entitled to a two-point downward adjustment as a `minor' participant if he is deemed `less culpable than most other participants but [his] role could not be described as minimal.' " United States v. Rojas-Millan, 234 F.3d 464, 472 (9th Cir. 2000) (quoting U.S.S.G. § 3B1.2 cmt. n.3). The defendant is to be compared to all participants in the illegal activity, not just to his codefendants. Id. at 473. Whether a defendant is a minor or a minimal participant under U.S.S.G. § 3B1.2 is a factual determination reviewed for clear error. United States v. Ruelas, 106 F.3d 1416, 1419 (9th Cir. 1997); United States v. Sanchez-Lopez, 879 F.2d 541, 557 (9th Cir. 1989).
 
 
 27
 The district court refused to give Appellant Rodriguez-Cruz a reduction for a minor role, although it gave one to both Gutierrez-Sanchez and Meza-Rosario. The different treatment hinged on the district court's conclusion that, unlike the other two, Rodriguez-Cruz was a "guide in training" under El Pajaro. The district court also found that Rodriguez-Cruz was a necessary participant in the smuggling operation by stating, "he wasn't so dispensable that anyone else could do it."
 
 
 28
 Rodriguez-Cruz's Presentence Report indicates that he admitted to border patrol agents that he was a guide in training who was being paid and who had previously assisted in guiding aliens. Thus, his role was less significant than El Pajaro's but more significant than Gutierrez-Sanchez's or Meza-Rosario's. As stated by the district court, had he been apprehended and convicted, El Pajaro would have been subject to an upward adjustment under § 3B1.1 for his aggravating role as the organizer of the smuggling operation. As a mere guide in training, Rodriguez-Cruz was spared this upward adjustment. But as a guide in training, he was found to be disqualified from receiving the downward adjustment for having only a minor role. The district court's decision rationally allocates increasing punishment in order of ascending culpable role. Accordingly, concluding that Rodriguez-Cruz did not have a minor role was not clearly erroneous.
 
 
 29
 D. Degree of Departure from the Guidelines for Meza-Rosario
 
 
 30
 Meza-Rosario argues that his 3-level departure from the Guidelines was inadequate. He argues that a substantial downward departure from the Guidelines was warranted because (1) the snowstorm, which actually caused the death, was unforeseeable, and (2) he volunteered to stay behind with the first person who lagged, gave others some of his food, and declined the opportunity to flee the scene in order to call for help and ensure that the rescuers were headed in the right direction.
 
 
 31
 We review departures from the Guidelines for abuse of discretion. Koon v. United States, 518 U.S. 81, 96-100 (1996); United States v. Sablan, 114 F.3d 913, 916 (9th Cir. 1997) (en banc). If the district court departs for reasons that are permissible under the Guidelines, then the extent of the departure is within the district judge's discretion. Id. 917-19 ("[W]here . . . a district court sets out findings justifying the magnitude of its decision to depart and the extent of departure from the Guidelines, and that explanation cannot be said to be unreasonable, the sentence imposed must be affirmed."); United States v. Roston, 168 F.3d 377, 379 (9th Cir. 1999) (affirming departure that increased sentencing range from 151-188 months to 324-405 months); United States v. Green, 1522 F.3d 1202, 1209 (9th Cir. 1998) (per curiam) (affirming 11-level downward departure for rehabilitation). However, we will reverse if the extent of a departure is grossly disproportionate to objective criteria. See United States v. Nagra , 147 F.3d 875, 886 (9th Cir. 1998) (reversing upward departure for a conspiracy involving 180 aliens because of the gross disproportionate severity of the departure compared with the Guidelines provisions for up to 100 aliens); United States v. Mathews, 120 F.3d 185, 189 (9th Cir. 1997) (reversing upward departure that increased the sentencing range by 24 to 73 months where the conduct justifying the enhancement would result in a sentence of 2 to 8 months if charged as a separate crime).
 
 
 32
 Meza-Rosario does not argue that the district court considered impermissible reasons in setting the extent of his downward departure, so we review to ensure that the extent of the departure was not unreasonable. The district court made a reasoned decision. First, the district court sympathized with Appellants because the snowstorm was unexpected and because they assisted the immigrants in the mountains, called for help once they reached the highway, and then declined the opportunity to flee the scene in order to point the rescuers in the right direction. For that reason, all received a downward departure from the Guidelines of at least two levels. Gutierrez-Sanchez received the largest departure (4 levels) because he was the one who actually called the authorities to request help. Meza-Rosario received a slightly lesser departure (3 levels) because he did not actually call. Such an approach--giving an increasingly large departure to a defendant who was increasingly helpful--was not an abuse of the district court's discretion.
 
 V. Conclusion
 
 33
 For the reasons expressed above, Appellants' sentences are AFFIRMED.
 
 
 
 Notes:
 
 
 *
 Honorable John M. Duhe, Jr., Senior United States Circuit Judge for the Fifth Circuit, sitting by designation.
 
 
 [1]
 The record on appeal does not indicate how Guillermo's group spent the first night, but we assume that it was similarly uneventful.
 
 
 [2]
 Border Patrol Search Trauma and Rescue
 
 
 [3]
 Appellants all received a downward departure from the Guidelines: Rodriguez-Cruz, two levels; Gutierrez-Sanchez, four levels; Meza-Rosario, three levels. Their respective sentences were 37, 24, and 27 months.