IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 02-40108
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

INOCENCIO GARCIA-GUERRERO

Defendant-Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

December 2, 2002

Before KING, Chief Judge, and JOLLY and HIGGINBOTHAM, Circuit Judges.

KING, Chief Judge:

On September 18, 2001, Defendant Inocencio Garcia-Guerrero ("Garcia") pled guilty without a plea agreement to three counts of knowingly and recklessly transporting an undocumented alien for purposes of financial gain in violation of 8 U.S.C. § 1324. On January 2, 2002, the district court sentenced Garcia to forty-eight

1

months of imprisonment on each count (to run concurrently).[1]  To arrive at the guideline sentencing range, the district court enhanced Garcia's sentence under U.S.S.G. § 2L1.1(b)(5) for reckless endangerment during the alien smuggling and under U.S.S.G. § 2L1.1(b)(6)(4) for the death of an alien resulting from the smuggling.

Garcia appeals both enhancements.  On appeal, the discrete issues before the court are thus whether the district court erred in enhancing Garcia's base offense level under U.S.S.G. § 2L1.1(b)(5) and under U.S.S.G. § 2L1.1(b)(6)(4).  We find no error.

## FACTS AND PROCEDURAL HISTORY

On June 4, 2001, Garcia approached a group of nine undocumented aliens in San Luis, Potosi, Mexico, and informed them that he was their guide into the United States (to San Antonio). After taking a bus to Nuevo Laredo and purchasing a medium bottle of water and two cans of food each, members of the group took canoes across the Rio Grande River.[2]  They entered the United

---

[1]   He also imposed a three-year term of supervised release for each count (to run concurrently) and imposed a special assessment fee of $300.  No fine was imposed.

[2]   Members of the group told agents that Garcia represented to them that the length of the journey through the brush would be only one day and that had they been aware of the actual length of the journey, they would have purchased adequate provisions for themselves in Nuevo Laredo.  Although Garcia initially told agents that he represented to the aliens that the journey would be three days, in his appellate brief, he admits

States at approximately 6:00 a.m. on July 5, 2001. Once here, Garcia walked the group through the brush from early morning until midnight at intervals of four-to-five hours with twenty-minute rest periods in between the intervals. The following day, Garcia commenced the walking ritual at approximately 7:00 a.m. At approximately 11:00 a.m., Alma Delia Simon-Fernandez, a member of the group, became too ill to continue the trek with the group.[3] Her uncle, Jaime Gomez-Arroyo, remained behind with her while the other members of the group continued the journey. At some point that afternoon, Simon-Fernandez fell asleep and stopped breathing. Gomez-Arroyo sought help from a nearby ranch hand.

In the late afternoon on June 6, 2001, border patrol agents from the Laredo South Station were notified by the ranch hand that an undocumented female alien was in apparent distress at the La Moca Ranch. When agents and emergency technicians arrived at the ranch, they found the body of Simon-Fernandez. As indicated by the PSR, the autopsy found the sole cause of her death to be "probable heat stroke."

The border patrol agents met with Gomez-Arroyo. In a search of the surrounding area, they found the other members of the group, which consisted of seven additional undocumented aliens and Garcia.

representing the length of the journey to be one full day through the brush.

[3] As reflected in the record, the autopsy report describes Simon-Fernandez as a 142-pound, normally developed and adequately nourished adult female.

3

Two of the aliens in the group needed medical attention, and, according to the probation officer at sentencing, were in the hospital for two weeks recovering from their injuries.[4]

In a sworn statement to a border patrol agent, Garcia stated that he was the only guide for the group, that he was guiding the group to San Antonio for financial gain ($400 per alien), and that he had transported aliens through South Texas on two prior occasions.

The district court enhanced Garcia's base offense level for recklessly creating a substantial risk of death or serious bodily injury to another person while transporting unlawful aliens into the United States from a base offense level of fifteen to a base offense level of eighteen.[5]  It found that while Garcia did not "create" the sun and desert, the trafficking of illegal aliens across South Texas to avoid detection requires moving the aliens in "odd ways for the very purpose of committing this crime," and that "taking these risks" increases the successfulness of the offense

---

[4]    The record reflects that these two aliens were both adult males found by the emergency personnel to be "severely dehydrated," showing "acute signs of heat stroke," and requiring "rapid cooling measures."  Both were immediately transported to a hospital in Laredo.

[5]    U.S.S.G. § 2L1.1(b)(5) provides for an increase in the base offense level of two levels, but states that "if the resulting offense level is less than level eighteen, increase to level 18."  U.S. SENTENCING GUIDELINES MANUAL, § 2L1.1(b)(5)(2001).  Since a two-level enhancement would have resulted in a base offense level of seventeen, the district court increased the base offense level to the minimum level of eighteen as prescribed by the guideline.

4

and ultimately creates "a situation just asking for —— a disaster." The district court then enhanced Garcia's base offense level eight levels for the death of Simon-Fernandez.

## STANDARD OF REVIEW

This court reviews the application of the sentencing guidelines <u>de novo</u> and reviews the district court's findings of fact for clear error.  <u>See</u> <u>United States v. Jefferson</u>, 258 F.3d 405, 412 (5th Cir. 2001).  Further, this court will uphold a sentence unless it was imposed in violation of law or as a result of an incorrect application of the sentencing guidelines or it is outside the range of the applicable guideline and is unreasonable. <u>See</u> <u>United States v. Garcia</u>, 962 F.2d 479, 480-81 (5th Cir. 1992).

## RECKLESS ENDANGERMENT AND DEATH ENHANCEMENTS

### A.   U.S.S.G. § 2L1.1(b)(5)

Garcia maintains that the district court erred in enhancing his sentence under the reckless endangerment enhancement because (1) he did not engage in any conduct specifically mentioned in the commentary to the alien smuggling guideline, (2) he did not engage in conduct similar to the examples of "reckless conduct" listed in the applicable commentary to the alien smuggling guideline, and (3) even if leading the group, on foot, through the South Texas brush in June is reckless conduct similar to that listed in the guideline commentary, he did not make the aliens go on the journey with him and thus did not "creat[e] a substantial risk" within the

meaning of the guideline.  As a final argument, on the day this court heard oral argument in this case, counsel for Garcia submitted to the court a Rule 28(j) letter arguing that Garcia did not possess the requisite subjective intent for the enhancement.

### (1) "Reckless Conduct"

U.S.S.G. § 2L1.1(b)(5), found in the Guideline section for Smuggling, Transporting, or Harboring Illegal Aliens, provides for an enhancement of the base offense level "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person."  U.S. SENTENCING GUIDELINES MANUAL, § 2L1.1(b)(5)(2001).  Application Note 6 to the commentary to the guideline provides that,

> Reckless conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition . . . .)

Id. at cmt. 6.[6]

This court recently addressed U.S.S.G. § 2L1.1(b)(5).  In United States v. Cuyler, 298 F.3d 387 (5th Cir. 2002), the court affirmed the district court's application of the reckless endangerment enhancement where the defendant pled guilty to

---

[6]     "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."  Stinson v. United States, 508 U.S. 36, 38 (1993).

transporting undocumented aliens in his extended cab pickup truck for financial gain.  There, seven aliens were found riding in the cab of the truck and four aliens were found lying down in the bed of the pickup truck.  Id. at 388.  This conduct was found to constitute "reckless conduct" for purposes of the enhancement even though it was not specified in the commentary to the guideline. Thus, while Garcia is correct that the commentary does not expressly state that guiding a group of aliens through the South Texas desert-like brush in June is "reckless conduct" to which the adjustment applies, this argument was squarely rejected by our court in Cuyler.

Further supporting a finding that the enhancement applies to the conduct at issue is the language of the commentary itself.  The commentary expressly states that the adjustment applies to "a wide variety of conduct."  The listed examples of "reckless conduct" in the commentary include situations that, for one reason or another, pose inherently dangerous risks to the aliens being transported. While, as with Cuyler, most of the cases discuss § 2L1.1(b)(5) in the context of risky conduct related to vehicular transportation of illegal aliens, these cases in no way restrict "reckless conduct" to conduct related to vehicular transportation.  Further, while this court has not had the opportunity to address the application of § 2L1.1(b)(5) to conduct similar to that now before the court, the Ninth Circuit recently upheld the application of § 2L1.1(b)(5) to a factual scenario similar to that before the court.  See United

7

States v. Rodriquez-Cruz, 255 F.3d 1054 (9th Cir. 2001). Defendants in Rodriquez were guides employed by alien smugglers to transport, for financial gain, illegal aliens into the United States via the mountains between Mexico and San Diego. Id. at 1056-57. The group of aliens was not well informed regarding the length of the journey or the weather conditions they would face during the journey. Id. They lacked the proper food supplies and, for the most part, lacked insulated clothing. Id. An unexpected snowstorm made weather conditions unbearable for the group. Id. The defendants ultimately used an emergency call box to request emergency assistance and remained at the scene for authorities. The court of appeals upheld the district court's application of § 2L1.1(b)(5), stating that,

> We conclude that U.S.S.G. § 2L1.1(b)(5) encompasses [defendants'] conduct of assisting alien smugglers. . . the mountains rise to an elevation of over 4,000 feet and contain rugged terrain that is riddled with canyons, streams, and other obstacles . . . The temperature can drop to as low as 36 degrees at night, and there is the potential for rain during that time of year. In addition to possible severe weather, the government correctly pointed out the other dangers of such a journey: lack of food and water, the potential for injury, and the risk of water-borne parasites or disease.

Id. at 1059. In this factually similar case, we too are persuaded to extend § 2L1.1(b)(5) to the conduct at issue. We look at the entire picture. Here, the PSR indicates that the temperature on June 5, 2001 reached 100 degrees and the temperature on June 6, 2001 reached 105 degrees. Each of the aliens had only one bottle

8

of water (which was depleted six hours after the journey began) and two cans of food, and several aliens told border patrol agents that they would have bought more water and food had Garcia accurately advised them of the length of the journey. The aliens requested, and were denied, longer rest periods. The fact that one member of the group died from "probable heat stroke" and two others required rather extensive hospitalization underscores the dangerous nature of the trek through the brush. We agree with the district court that the conduct is covered by § 2L1.1(b)(5).

### (2) Causation

Cuyler is also instructive to counter Garcia's argument that the enhancement is improper here because Garcia did not cause or create the substantial risk at issue. The district court correctly concluded that the guideline use of the phrase "creating a substantial risk" focuses on whether the chosen manner of traveling is "a very dangerous way to travel." In Cuyler, the offense conduct at issue – transporting unrestrained aliens in the bed of a pickup truck – was central to the court's inquiry. As to this conduct, the court questioned whether this type of offense conduct creates a substantial risk of death or serious bodily injury. In so doing, it stated that,

> [T]he issue is whether this particular offense "intentionally or recklessly creat[ed] a substantial risk of death or serious bodily injury to another person." The defendant transported illegal aliens for money, knowing that the persons involved were illegal aliens. Aliens who are unrestrained easily can be thrown from the

> bed of the pickup in the event of an accident or other driving maneuver of the sort that is unavoidable in highway driving. The offense in this appeal meets the requirements of § 2L1.1(b)(5).

Id. at 391. As found by the district court, when Garcia "stepp[ed] up to the plate and [said] I will guide you through the hot South Texas desert in the dead of summer," he placed these individuals in a substantially risky situation within the meaning of the guideline. Although Garcia had no control over the conditions, he was responsible —— and was to receive compensation for —— guiding these individuals and thus "creat[ed]" the substantial risk within the meaning of the guideline in the same way the defendants in Cuyler were responsible for "creating" the substantial risk there.

As stated, the guideline itself uses the phrase "creating a substantial risk." U.S. SENTENCING GUIDELINES MANUAL, § 2L1.1(b)(5)(2001) (emphasis added). However, Congress, through the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009-566 ("IIRIRA"), directed the Sentencing Commission to allow for the imposition of "an appropriate sentencing enhancement on a defendant who, in the course of committing an [alien smuggling] offense . . . engages in conduct that consciously or recklessly places another in serious danger of death or serious bodily injury." H. R. CONF. REP. No. 104-863, at 580 (1996). A comparison of the House Conference Report with the final version of Sentencing Guideline § 2L1.1(b)(5) demonstrates that Congress intended courts to require a less

10

stringent causal nexus between the defendant's actions and the substantial risk facing the aliens than that proposed by Garcia. The court can glean from the Report that the defendant does not have to manufacture the dangerous condition. Rather, Garcia engaged in conduct that placed the aliens in substantial risk of death or serious bodily injury for enhancement purposes when he transported aliens through the hot South Texas brush in the heat of the summer with inadequate water and food.

### (3) Intent

Finally, Garcia argues that the enhancement under § 2L1.1(b)(5) is erroneous because he did not possess the requisite subjective intent. This argument was not raised until oral argument in this court, and will not be addressed.

The district court did not clearly err in enhancing Garcia's sentence under § 2L1.1(b)(5).

### B. U.S.S.G. § 2L1.1(b)(6)(4)

Garcia contends that the district court erred in enhancing his base offense level eight levels for the death of Simon-Fernandez because he neither intended to cause her death nor caused her death within the meaning of the guideline. The district court rejected Garcia's arguments, stating that it "ha[d] not the slightest doubt at all that trudging through the hot South Texas desert in June was at least a cause of her death." It further found that Garcia,

> recklessly created a substantial risk of death. I think
> the lady died as a cause of the situation, that he led

11

and —— shepherded them through the —— and I don't have the slightest doubt about that by any standard of evidence . . . I don't think there's any doubt at all that this trek through the desert contributed to her death.

U.S.S.G. § 2L1.1(b)(6)(4) provides that, "[i]f any person died or sustained bodily injury, increase the offense level according to the seriousness of the injury." U.S. SENTENCING GUIDELINES MANUAL, § 2L1.1(b)(6)(2001). It then prescribes an eight-level increase in the base offense level for the death of an individual.

### (1) Intent

While this court has not addressed whether intent is required for an enhancement under § 2L1.1(b)(6), case law from the Ninth Circuit is again instructional. In <u>United States v. Herrera-Rojas</u>, 243 F.3d 1139, 1144 (9th Cir. 2001), the court of appeals addressed § 2L1.1(b)(6). The <u>Herrera</u> court found that no intent requirement is necessary for an enhancement under this subsection, stating that,

> Section (b)(5), immediately preceding § (b)(6), specifies that intent or recklessness is required to hold a defendant responsible for creating the <u>risk</u> of death. Section (b)(6)(4) states simply that if death results, an increase is required. The failure to specify that intent is required, immediately following a section that specifies intent, is a clear indication that no intent is necessary for an increase under § (b)(6).

<u>Id.</u> (emphasis in original). The <u>Herrera</u> court's analysis of intent is persuasive. Plainly, Garcia does not have to intend the death of Simon-Fernandez for the enhancement to apply because the guideline does not require it.

12

### (3) Causation

Garcia also avers that the enhancement was nevertheless improper because the causal connection between the offense conduct and the death of Simon-Fernandez is weak. In a footnote, the Herrera court states that "[w]e assume . . . that for § (b)(6) to apply, the relevant death or injury must be causally connected to dangerous conditions [covered by § (b)(5)] created by the unlawful conduct . . . ." Id. at n.1; see also Rodriguez, 255 F.3d at 1059 (enhancing the base offense level eight levels only "[b]ecause Appellants were [also] subject to § (b)(5) for recklessly creating the [substantial] risk"). We need not decide whether a causal link between the substantially risky conduct (addressed under § (b)(5)) and the death of an individual (addressed under § (b)(6)) must exist for an enhancement under § (b)(6). Here, the conduct creating a substantial risk of death or serious bodily injury (leading the group through the desert-like South Texas brush in the middle of summer without adequate food, water, and rest periods) and the death of Simon-Fernandez are causally yoked such that adopting Herrera's pronouncement in footnote 1 is unnecessary. The autopsy report, the weather conditions, the lack of water and food, the manner of death, and the need for two other group members to also receive rather extensive medical treatment as a result of the extreme heat, all support the district court's finding that Simon-Fernandez died from conditions encountered during the dangerous journey.

13

**CONCLUSION**

The district court did not err in enhancing Garcia's sentence under U.S.S.G. § 2L1.1(b)(5) and under U.S.S.G. § 2L1.1(b)(6)(4). The sentence is AFFIRMED.

14