# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2008

Charles R. Fulbruge III
Clerk

No. 07-40962

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAUL MATEO GARZA, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, DeMOSS, and STEWART, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Raul Garza pleaded guilty of transporting an unlawful alien. He appeals the enhancement of his sentence according to U.S.S.G. § 2L1.1(b)(6) (2006) for creating a "substantial risk of death or serious bodily injury to another person." We vacate and remand for re-sentencing.

I.

In late April 2007, Captain L. Valadez, a Jim Wells County Sheriff's Deputy, stopped Garza's red pickup truck because of an obstructed license plate. Valadez observed a person in the front passenger's seat and three passengers lying down in the cab of the truck. An immigration inspection revealed that all four passengers were illegal aliens. Garza stated that he had picked them up in Falfurrias, Texas, and was giving them a ride to Alice, Texas.

As part of his guilty plea, Garza stipulated to the testimony of two of the passengersSSVictor Mejia-Lopez and Jose Diaz-Munoz. Mejia-Lopez testified that he and three others, assisted by a guide, had illegally entered the United States by crossing the Rio Grande. After entering the country, a man picked them up in a white pickup truck, and they rode for about an hour-and-a-half. Mejia-Lopez was taken to a location in the South Texas brush, where he and the others were dropped off and told to walk around an immigration checkpoint.

The walk through the brush lasted about ten hours. Mejia-Lopez got lost and was separated from his group, but the following morning he encountered another group of about ten persons, also with a guide. The group, led by the guide, walked for about an hour through the brush to a road where Garza waited in his red pickup. Mejia-Lopez and three others entered the truck; Garza told them to lie down. Mejia-Lopez was going to Houston, Texas.

Diaz-Munoz testified that he entered the United States illegally, along with about seven other illegal aliens, by crossing the Rio Grande. After entering, the group walked through the brush for about four hours to a motel, where they stayed for a day. At their guide's instruction, the aliens entered a green pickup truck, traveled for about an hour, and were transported to an unknown location in the brush and dropped off. Another guide walked with the group in the brush for about a day to an unknown road. The guide instructed Diaz-Munoz, Mejia-Lopez, and two others to get into Garza's pickup truck. Diaz-Munoz stated that

Garza knew they were illegal aliens, because Garza instructed three of them to hide in the back of the truck. Diaz-Munoz stated that he was also traveling to Houston.

## II.

Garza pleaded guilty to two counts of transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (B)(ii). The presentence report ("PSR") recommended a base offense level of 12 pursuant to U.S.S.G. § 2L1.1(a)(3) (2006), which was increased to 18 under § 2L1.1(b)(6) for "intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." The PSR justified the increase on the grounds that Garza (1) transported unsecured aliens in his vehicle and had done so in the past and (2) subjected them to the hazardous conditions of the South Texas brush for more than a day. The PSR determined Garza could be responsible for the latter, because a defendant is responsible for all reasonably foreseeable acts and omissions of others in jointly undertaken criminal activity. See § 1B1.3(a)(1)(B). After a three-level reduction for acceptance of responsibility, Garza's offense level was 15, which, combined with a criminal history category of III, yielded a guideline range of 24 to 30 months' imprisonment.

Garza objected to the recommended increase for reckless endangerment. At the sentencing hearing, the probation officer asserted a correction to the PSR SSGarza's criminal history category should have been II, rather than III as set forth in the PSRSSand the government consented. Based on a total offense of 15 and a criminal history category of II, the new range was 21 to 27 months.

The court overruled Garza's objection to the reckless endangerment enhancement, adding, "The appellate court needs to recognize what's happening down here and to protect the integrity of the guidelines by letting the courts examine the circumstances of this crime and making a ruling that this activity,

and particularly in this case, is substantial [sic] risk of serious bodily harm."
Seeing this as an opportunity to get further instruction from this court, the district court added, "If [Garza] has a right to appeal, I want him to appeal it.  I want the Court of Appeals to write on it so that we can get some appellate guidance."  Based on a guidelines range of 21 to 27 months, the court sentenced Garza to 24-month concurrent terms of imprisonment, three-year concurrent terms of supervised release, and a $200 special assessment.

### III.

We review the application and interpretation of the guidelines de novo and the factual findings for clear error.  United States v. Solis-Garcia, 420 F.3d 511, 514 (5th Cir. 2005).  Whether a co-conspirator's actions were reasonably foreseeable is a factual determination.  United States v. Hull, 160 F.3d 265, 268 (5th Cir. 1998).

### A.

We first address whether Garza's sentence may be enhanced for the actions of the alleged co-conspirators who transported Mejia-Lopez and Diaz-Munoz, among others.  The sentencing guidelines do not require Garza to have been charged with conspiracy for the enhancement to apply if the acts of others were reasonably foreseeable to him.  See U.S.S.G. § 1B1.3(a)(1)(B).  A district court may therefore exercise wide evidentiary latitude at sentencing and may look to the whole conspiracy to determine whether the acts of others were reasonably foreseeable, see United States v. Robins, 978 F.2d 881, 891 (5th Cir. 1992), but it must still make specific findings as to the scope of that conspiracy, Hull, 160 F.3d at 269.  We will not upset these findings unless they are implausible in light of the record as a whole.  United States v. Condren, 18 F.3d 1190, 1199 (5th Cir. 1994).

The district court paints a compelling picture of the scope of this conspiracy, as it related to Diaz-Munoz, that is consistent with the record as a whole. For example, when asked why he got into Garza's red truck, Diaz-Munoz said the guide explicitly picked four members of the group to travel in it. At the very least, therefore, there was some communication between that guide and Garza regarding the transportation of illegal aliens from Mexico. Garza need not know the particulars of those aliens' sojournSSi.e., traveling through the brush for a daySSfor it to be reasonably foreseeable to him that they had traveled through the brush at all, because such information would have been communicated to him as part of scheduling the rendezvous. It was therefore not implausible for the district court to hold Garza responsible for the aliens' transportation through the brush.

Garza may not be held responsible for that part of Mejia-Lopez's sojourn that took place before Mejia-Lopez joined Diaz-Munoz's group, however. There is no evidence that Mejia-Lopez's group was in anyway related to Diaz-Munoz's; it follows that there is no evidence linking the two conspiracies. Although it may be reasonably foreseeable to Garza what actions members of his conspiracy might take, it could not be foreseeable that an alien traveling with another group would become separated from his original group, sleep in the brush, and meet up with the group guided by Garza's co-conspirator.

To hold Garza responsible for the actions of Mejia-Lopez's group would essentially impute to Garza the actions taken on behalf of every alien-smuggling operation. That would cast the net too widely; nor is this what is contemplated by the guidelines. See U.S.S.G. § 1B1.3(a)(1)(B) (discussing a defendant's activity taken in concert with others). Accordingly, only that part of Mejia-Lopez's experience after he joined Diaz-Munoz's group can properly be assigned to Garza for purposes of sentencing.

B.

The next question is whether the district court erred in applying U.S.S.G. § 2L1.1(b)(6), which calls for a two-level enhancement "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person." The commentary to § 2L1.1 provides examples of the conduct that falls within the guideline:

> Reckless conduct to which the adjustment from subsection (b)(6) applies includes a wide variety of conduct (e.g., transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a crowded, dangerous, or inhumane condition).

§ 2L1.1, cmt. 5. All the examples involve situations that "pose inherently dangerous risks to the aliens being transported." United States v. Garcia-Guerrero, 313 F.3d 892, 896 (5th Cir. 2002).

The district court premised its ruling on the notion that transporting aliens through the brush necessarily and always involves subjecting them to a substantial risk of death or serious bodily injury. Acknowledging that it did not have, "in the context of this case, information about the sojourn," the court noted that one could get lost in the brush and that there were regular television reports of people getting lost and separated from their groups and in some cases dying.

We have no reason to doubt the court's understanding of the conditions that exist along the border, but our caselaw does not support establishing a per se rule that traveling through the South Texas brush creates a "substantial risk of death or bodily injury." In fact, we have implied that we will not create such per se rules. See Solis-Garcia, 420 F.3d at 516 (explaining that "[d]efining the contours of this enhancement is dependent upon carefully applying the words of the guideline in a case-specific analysis").

In Garcia-Guerrero, 313 F.3d at 896, we addressed whether the reckless

endangerment enhancement applied in a case involving "guiding a group of aliens through the South Texas desert-like brush in June." The district court based its finding on the following evidence: The temperature reached 105 degrees; the aliens had one bottle of water among them, which was depleted six hours into the two-day journey; they had two cans of food; they were misinformed about the length of the journey; and they were denied adequate rest periods. Id. at 897. One died from probable heat stroke, and two others required hospitalization. Id. Looking at the "entire picture," we said those facts were sufficient to justify the enhancement. Id. We did not hold that transportation through the brush would always invoke the enhancementSSelse we need not have addressed the adequacy of the specific facts.

Nor does the guideline at issue condone the implication of a per se rule. The comment to § 2L1.1(b)(6) indicates that section applies to a "wide variety of conduct," but the examples given, with one exception, require courts to look at the specifics of the situation. U.S.S.G. §2I.1.1 cmt. 5. The only per se example given in the comment is the first, which covers transporting persons in a trunk or engine compartment of a vehicle. Id. Trunks and engine compartments are not designed to hold human passengers, so transporting someone in them is not safe. The South Texas brush, as inhospitable as it may be, cannot be analogized to trunks and engine compartments. As the district court acknowledged, people do live there.

The remaining examples are not per se rules, but flexible guidelines. The first example relates to "carrying substantially more passengers than the rated capacity of a motor vehicle or vessel." Id. The operative word is "substantially." It is not necessarily enough that a vehicle designed for four is carrying five. Probably carrying eight in the vehicle would be. But once again, the guidelines do not create hard and fast rules but are only guides that a district court must interpret in light of the situation before it.

The final example applies to "harboring persons in a crowded, dangerous, or inhumane condition." Id. This example logically can be applied only to the specific facts of an individual caseSSthe sentencing court must decide whether the conditions were "crowded, dangerous, or inhumane."

It is not enough to say, as the district court did here, that traversing an entire geographical region is inherently dangerous. It must be dangerous on the facts presented and used by the district court. To the extent that the record supports any particularized findings, they were that the aliens were guided through the brush for about one day in late April and that the mean temperature was 87 degrees. The court did not specifically base its sentence on those facts but instead on the very fact of traveling through the brush.

There is no evidence regarding whether the aliens were provided food and water or allowed rest periods during the one-day journey. The record does show that the group with which Garza had reasonably foreseeable knowledge slept overnight in a motel. This case is therefore distinguishable from Garcia-Guerrero, in which there were explicit facts to support the finding of inherent danger.

The sentence is VACATED and REMANDED for re-sentencing.