**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 10, 2013

Lyle W. Cayce
Clerk

No. 12-40367

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

JUAN RAMON MAGALLAN–RODRIGUEZ,

Defendant–Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 7:11-cr-01308

Before DeMOSS, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Defendant–Appellant Juan Ramon Magallan–Rodriguez ("Magallan") pleaded guilty, pursuant to a plea agreement, to harboring undocumented aliens for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iii), 1324(a)(1)(A)(v)(II), and 1324(a)(1)(B)(i). Following the recommendation of the Presentence Investigation Report ("PSR"), the district court enhanced Magallan's sentence under several Guidelines provisions. One enhancement was for committing an offense that "involved intentionally or recklessly creating a substantial risk of

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-40367

death or serious bodily injury to another person." Magallan objected to this enhancement at sentencing and on appeal argues the district judge erred in imposing it. We affirm.

## I. Background

On October 3, 2012, the District Court for the Southern District of Texas accepted Magallan's guilty plea as to count two of an indictment charging him with harboring illegal aliens for personal financial gain in violation of federal law. According to the PSR, Magallan was paid to maintain two properties used by an alien smuggling organization to hold undocumented aliens before they were transported further north. One property, located in Pharr, Texas, consisted of a frame ranch house, a mobile home, and a travel trailer (collectively, "the first stash house"). The other property was a single house located in Edinburg, Texas ("the second stash house"). Magallan was paid $250 for each truckload of undocumented aliens that was transported from the stash houses. In the three weeks before his arrest, three different pickup trucks arrived to transport between ten and thirteen undocumented aliens each. Magallan was also, in his capacity as caretaker of the two properties, given approximately $200 a week to provide food and toiletry items to the aliens held captive in the stash houses.

Law enforcement officials were alerted to the presence of the stash houses by two aliens who had escaped. Later that day, ICE agents initiated a traffic stop of Magallan after they observed him visiting the first stash house. Magallan consented to a search of the two stash houses. When the agents searched the properties, they found forty-six undocumented aliens being held against their will—thirty-seven at the first stash house and nine at the second.[1] It is unclear how long they had been there, but the two aliens who escaped had been held at the first stash house for twenty days, and another material witness

---

[1] A tenth individual was found at the second stash house, but was later identified as a legal permanent United States resident.

2

stated she had been held for two months. The undocumented aliens were often transferred between houses in order to avoid detection by law enforcement.

At the first stash house, some of the aliens were found inside the buildings themselves, and some were found in the surrounding brush. An agent who entered the first property noted that "although it did not appear that the conditions . . . were dangerous, the conditions were poor in that there was garbage, decomposing food[,] and mattresses all over the floors." There was a water cooler with water in it, but no food other than what was rotting on the floors.

The second stash house was apparently cleaner, but the house was unfurnished except for one mattress, a television, and a refrigerator, and there was no food obviously available. An agent who entered both properties indicated that none of the aliens complained that they were not fed or that they lacked access to water.

Using the 2011 version of the United States Sentencing Guidelines Manual ("USSG"), the probation officer prepared a PSR which calculated that Magallan's offense level was 28. The base offense level was determined to be 12, pursuant to USSG § 2L1.1(a)(3). The offense level was increased by 14 points for specific offense characteristics pursuant to USSG § 2L1.1(b): for the number of aliens harbored, § 2L1.1(b)(2)(B); for harboring an unaccompanied minor, § 2L1.1(b)(4); for intentionally or recklessly creating a substantial risk of death or serious bodily injury, § 2L1.1(b)(6); for causing serious bodily injury, § 2L1.1(b)(7); and for detaining through threat or coercion in connection with a demand for money, § 2L1.1(b)(8). The PSR also recommended a two-level enhancement for obstruction of justice based on Magallan's having made a threatening gesture to material witnesses while they were being kept in the holding block.

No. 12-40367

At his sentencing, Magallan registered seven separate objections to the PSR, including one to the suggested two-level increase for intentionally or recklessly creating a substantial risk of death or serious bodily injury. Magallan admitted to the conditions as described in the PSR, but argued that those conditions did not rise to the level required for the enhancement. The district court denied the objection, noting that "there were about 30 some people stashed in [the houses]." The judge continued, "With everything else that you've described plus the fact that you have that many people stored in a small area like that, yes, there's a reckless danger here."

All of Magallan's objections were denied, but the court did grant him a three-level decrease for acceptance of responsibility, bringing his total offense level to 25. In explaining why Magallan was receiving a two-level enhancement for reckless creation of a substantial risk of death or serious bodily injury, the judge stated:

> The Court is going to find that people were being cramped under the conditions that have been described in this Presentence Investigation Report, in addition to the fact that the Court can take judicial notice of all its years on the bench that whenever there is an illness with regards to an individual such as this under cramped quarters, there's always the risk of somebody else may have been subjected to any kind of illness that would be contagious. So there is a plus two.

Magallan's criminal history category was I, which, taken with his offense level of 25, yielded a Guidelines range of 57 to 71 months' imprisonment. The district court sentenced Magallan to 58 months in prison followed by a two-year term of supervised release. Magallan timely appealed his sentence.

## II. Discussion

### A. Standard of Review

A district court's factual findings are reviewed for clear error. *United States v. Cuyler*, 298 F.3d 387, 389 (5th Cir. 2002). The "application of factual

findings to the reckless endangerment enhancement" is reviewed de novo. *United States v. Torres*, 601 F.3d 303, 305 (5th Cir. 2010).  The factual findings underlying the legal determination of endangerment are not clearly erroneous "if the district court's finding is plausible in light of the record as a whole." *United States v. Cisneros–Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008).  A district court is permitted to draw reasonable inferences from the facts, and these inferences are fact-findings reviewed for clear error.  *United States v. De Jesus–Ojeda*, 515 F.3d 434, 442 (5th Cir. 2008).

The Government must prove the facts supporting a sentencing enhancement by a preponderance of the evidence.  *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007).  "[T]he district court may adopt facts contained in a PSR without inquiry, so long as the facts have an adequate evidentiary basis and the defendant does not present rebuttal evidence."  *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006).

**B. Analysis**

Under § 2L1.1(b)(6) of the Sentencing Guidelines, an individual's sentence for the offense of harboring an unlawful alien is enhanced if the offense "involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person."  USSG § 2L1.1(b)(6).  The commentary to the provision further explains:

> Reckless conduct to which the adjustment from subsection (b)(6) applies includes a wide variety of conduct (*e.g.*, transporting persons in the trunk or engine compartment of a motor vehicle, carrying substantially more passengers than the rated capacity of a motor vehicle or vessel, or harboring persons in a *crowded*, dangerous, or inhumane condition).

USSG § 2L1.1 cmt. n.5 (emphasis added).  The enhancement is "not limited to the examples provided in the commentary."  *United States v. Zuniga–Amezquita*, 468 F.3d 886, 888 (5th Cir. 2006).  Application of

§ 2L1.1(b)(6) is fact-intensive. *See United States v. Mateo Garza*, 541 F.3d 290, 294 (5th Cir. 2008) ("[T]he examples given [in the Guideline commentary], with one exception, require courts to look at the specifics of the situation."); *United States v. Solis–Garcia*, 420 F.3d 511, 516 (5th Cir. 2005) ("Defining the contours of this enhancement is dependent upon carefully applying the words of the guideline in a case-specific analysis.").

This Court has had only one opportunity to determine if conduct involved in housing aliens in stash houses justifies the enhancement. *See United States v. Teran*, 236 F. App'x 82, 83–84 (5th Cir. 2007) (per curiam) (unpublished) (affirming the enhancement where at least sixty-nine aliens were "kept in severely overcrowded conditions in two rear bedrooms of a stash house without running water or air conditioning, [and] allowed to use restroom facilities and given water only once per day"). While it appears the conditions in the stash houses in *Teran* posed a greater risk of death or serious bodily injury, we conclude that the enhancement is also warranted in this case. Although the PSR provided no information about the dimensions of the structures, Magallan does not dispute that nearly fifty individuals were housed in only two houses, a mobile home, and a travel trailer. The Guidelines commentary clearly states that "crowded" conditions can be grounds for applying the enhancement. *See* USSG § 2L1.1 cmt. n.5. That forty-seven people were forced to live for many weeks in such inadequate housing is sufficient to affirm the district court's imposed sentence.

The enhancement can also be upheld on the grounds that the PSR indicates some aliens were transported in the bed of a pickup truck. This Court held in *United States v. Cuyler* that transporting aliens unsecured in the bed of a pickup truck constituted reckless endangerment. 298 F.3d at 389–91. The PSR indicates that pickup trucks came to transport aliens from the stash houses. The district court was free to infer from the fact that between ten and thirteen

No. 12-40367

aliens were transported at once that at least some were transported unsecured in the truck bed. While we acknowledge that this Court has cautioned against the creation or application of per se rules in the context of this enhancement, we conclude that combined with the crowded conditions at the stash houses, *Cuyler*'s holding is sufficient grounds to find that the enhancement applies. *See Mateo Garza*, 541 F.3d at 294 (noting that "we have implied that we will not create . . . *per se* rules" in the fact-intensive context of this enhancement).

## III. Conclusion

For the foregoing reasons, we AFFIRM the sentence imposed by the district court.