# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-11080

United States Court of Appeals
Fifth Circuit

**FILED**

April 8, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FREDERICK HERNANDEZ,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:14-CR-18-1

Before STEWART, Chief Judge, and KING and ELROD, Circuit Judges.

PER CURIAM:*

Defendant-Appellant Frederick Hernandez pled guilty to making false statements and aiding and abetting in violation of 18 U.S.C. §§ 1001 & 1002 after he was charged in connection with an investigation that took place after an inmate committed suicide at the federal correctional center where he was

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-11080

employed as a correctional officer.[1]  On appeal, he challenges the sentence imposed by the district court following his guilty plea conviction.  We affirm.

## I. FACTS & PROCEDURAL BACKGROUND

Hernandez was employed as a correctional officer ("CO") at the Big Spring Correctional Center ("BSCC") in Big Spring, Texas from 1999 until August 2012.  The facility had a Special Housing Unit ("SHU") that was used to house high-risk inmates under administrative detention and disciplinary segregation.  Due to the nature of the high-risk inmates housed in the SHU, the COs assigned to the unit had additional duties, including documenting in writing that they had conducted random safety checks every 30 minutes during their shifts, with notations for any unusual activity or reasons if one or more of the rounds could not be conducted.  Formal inmate counts and fire and safety checks of the unit were to also be conducted several times during a 12-hour shift and documented in writing.  The COs assigned to the SHU were also required to sign Post Orders Quarterly Signature Sheets, which confirmed that they had read and understood the specific requirements for working with the high-risk inmates housed in the SHU.

Inmate Luis Bent was housed in the SHU when he committed suicide in his cell on August 23, 2012.  Prior to his death, Bent was transferred upon his own request to the SHU on August 21, 2012.  On August 22, 2012, Bent was evaluated by medical personnel.  According to the progress notes taken at that time, Bent's mental state had deteriorated significantly since his last evaluation a week prior on August 15, 2012.  Bent's August 15th evaluation indicated that his sleep, mood, energy and appetite were all "good" and

---

[1] Frederick Hernandez's term of imprisonment is scheduled to be completed on August 25, 2015.  As such, Hernandez filed a motion to expedite consideration of his appeal on January 26, 2015.  This court granted the motion on January 30, 2015.

"normal." Bent's August 22nd evaluation, which took place at 1:20 p.m. the day after his transfer to the SHU, indicated that he was paranoid, rambling, and that he had "[l]oosening of associations, poor judgment, poor insight; no suicidal thoughts, no homicidal thoughts[.]" (emphasis in original). Although the record indicates that some of the COs were generally aware of Bent's medical evaluation, there is nothing in the record indicating that Hernandez or any of other the COs reviewed the August 22nd progress notes, nor have they claimed to have reviewed the progress notes.

CO Joey Rosas worked in the SHU from 8:00 p.m. to 11:45 p.m. on August 22, 2012. Rosas stated in subsequent investigations that he had expressed concerns about Bent's mental state prior to Bent's suicide. He also stated that he was personally told when he arrived for his August 22nd shift that Bent had been evaluated by medical personnel earlier that day (approximately 1:20 p.m.) who had determined at that time that he was "thrown off" but "okay."

Hernandez also reported for his shift that day at 8:00 p.m. and was assigned to work in the control room while other officers were assigned to conduct rounds and patrol the perimeter. Hernandez stated that when he and the other officers arrived for their shifts, the COs from the previous shift informed them that Bent had been behaving strangely and acting "crazy" during shift change, which was several hours after his medical evaluation when it was reported that he was "okay." The COs were also informed that Bent was reportedly acting "suicidal" and holding up signs in his cell door which read "DEA," "death," and "help."

CO Christopher Moore began his shift just after midnight at 12:15 a.m. on August 23, 2012. He stated that, while he was in the control room where Hernandez was assigned to work with other correctional officers, they

No. 14-11080

discussed a prior suicide attempt which had occurred earlier that month in the SHU.

During the course of Hernandez's shift, he conducted a mandatory move of inmates from one cell to another, a procedure carried out every 21 days. After moving the inmates, Hernandez provided them with supplies to clean their cells. Lights in the SHU were turned off at 11:00 p.m. While the lights were off in the SHU, the COs completed their required paperwork. The paperwork included SHU Control Log forms initialed and submitted by Hernandez indicating that official inmate counts had been conducted at 12:01 a.m., 3:00 a.m., and 5:00 a.m. Hernandez also initialed and submitted forms signed by the other COs assigned to that shift indicating that each required 30-minute safety check had been conducted.

The lights were not turned on again until Hernandez turned them on at 5:26 a.m. on August 23, 2012. Almost immediately thereafter, Hernandez was notified that Bent had been found dead in his cell, hanging from a bed sheet. Hernandez reported the incident to the main control center, notified the medical department, and requested 911 emergency services. Bent was then transported to Scenic Mountain Hospital in Big Spring, Texas where he was pronounced dead. The cause of death was determined at that time to be suicide.

An investigation commenced into the events prior to Bent's death, focusing on the 12-hour shift during which Hernandez and the other COs worked, beginning on August 22 and ending on August 23, 2012. Ultimately, Hernandez admitted to entering false information on the forms indicating that the official inmate counts had been conducted. He also admitted to initialing and submitting the falsified reports compiled and signed by the other COs indicating that they had conducted the mandatory 30-minute safety checks, 24 of which were required to be performed during each 12-hour shift. In total, the

investigation revealed that not a single 30-minute safety check or formal inmate count was conducted during Hernandez's shift, which amounted to dozens of falsified log entries showing that the checks and counts had been performed. Hernandez and the other COs admitted that the practice of falsifying the forms to indicate that the safety checks and formal inmate counts had been conducted was a common, long-standing practice among the officers working in the SHU. Hernandez stated that the practice of falsifying forms was in part a result of staff shortages, 12-hour shifts, and the assignment of officers to the SHU who were not familiar with working there. Hernandez and the other COs connected to the incident were terminated.

Hernandez and the other officers were charged in a 7-count indictment for making false statements and aiding and abetting, based on having signed and submitted falsified SHU Control Log forms and the falsified 30-minute safety check forms. Pursuant to a written plea agreement, Hernandez pled guilty to Count 7 of the 7-count indictment, which adjudged him guilty of violating 18 U.S.C. §§ 1001 & 1002—false statements and aiding and abetting—on account of having signed and submitted to the Department of Justice the falsified SHU Control Log form certifying that the mandatory formal inmate counts had been conducted during his shift. In accordance with his plea agreement, Hernandez waived his right to appeal his conviction but reserved the right to directly appeal "any issue arising from sentencing." The district court accepted the plea agreement and entered judgment in accordance therewith.

The presentence investigation report ("PSR") recommended a base offense level of 6, with an increase to level 14 pursuant to U.S.S.G. § 2B1.1(b)(15)(A) for an offense that involved "the conscious or reckless risk of death or serious bodily injury." A subtraction of 2 levels for acceptance of responsibility resulted in a total offense level of 12. Hernandez also had a

No. 14-11080

criminal history category of I. This produced an advisory guidelines range of 10 to 16 months' imprisonment.

Hernandez objected to the "conscious or reckless risk" enhancement, arguing that that the legal definition of "reckless" required that he consciously disregard a known risk and he was not aware of Bent's suicidal intent. The PSR Addendum maintained that Hernandez disregarded specific policies set forth for the care and custody of high-risk inmates housed in the SHU and information regarding Bent's mental state, including statements from other officers indicating that he was acting "crazy" and "suicidal" hours before he committed suicide in his cell. The Addendum further reasoned that Hernandez's "failure to perform the duties required of [his position], which might produce death and was reckless, resulted in the death of an inmate known to be a risk for suicide."

Overruling Hernandez's objection to the enhancement and adopting the findings of the PSR and PSR Addendum, the district court sentenced him to 10 months' imprisonment, stating that "it adequately address[es] the sentencing objectives of punishment and deterrence." Hernandez was also sentenced to two years of supervised release following the completion of his sentence and payment of a mandatory special assessment.

Hernandez is currently serving his 10-month prison sentence and has filed this appeal.

## II. DISCUSSION

It is undisputed that Hernandez preserved his challenge to the application of the sentencing enhancement under U.S.S.G. § 2B1.1(b)(15)(A). On appeal, Hernandez asserts two primary arguments with respect to the sentencing enhancement. First, he contends that the district court erred by interpreting the enhancement as requiring only objective knowledge by the defendant of the risk of death or serious bodily injury, rather than subjective

knowledge of the risk.  Second, he argues that the district court erred in finding that he should have known that inmate Bent presented a risk of suicide.  We find these arguments unpersuasive.

### A. Standard of Review

"This court reviews the application of the sentencing guidelines de novo and reviews the district court's findings of fact for clear error."  *See United States v. Garcia-Guerrero*, 313 F.3d 892, 895 (5th Cir. 2002) (citation omitted).  "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole."  *See United States v. Duncan*, 191 F.3d 569, 575 (1999) (citation omitted).  "[T]his court will uphold a sentence unless it was imposed in violation of law or as a result of an incorrect application of the sentencing guidelines or it is outside the range of the applicable guideline and is unreasonable."  *Garcia-Guerrero*, 313 F.3d at 895 (citation omitted).

### B. Analysis

The U.S. Sentencing Guidelines provide under Section 2B1.1(b)(15)(A) that, if the offense at issue involved "the conscious or reckless risk of death or seriously bodily injury," then "increase to level 14."  *See* U.S.S.G. § 2B1.1(b)(15)(A).  Consequently, the primary issue in these proceedings is whether the sentencing enhancement applied by the district court required Hernandez to have subjective or objective knowledge of the risk of death or serious bodily injury.  As noted by both parties, the Guidelines do not define "conscious or reckless risk of death or serious bodily injury," and the application notes do not mention the provision.  Further, this court has not ruled on this issue before.

Several of our sister circuits, however, have ruled on this issue.  The majority of those circuits have held that the Government is not required to prove that the defendant was subjectively aware of the risk, but rather only that the defendant was objectively aware of the risk, *i.e.*, that the risk "would

7

have been obvious to a reasonable person." *See United States v. Maestas*, 642 F.3d 1315, 1321 (10th Cir. 2011) (reasoning that "recklessness is generally an objective standard" and that "a defendant's conduct involves a conscious risk if the defendant was subjectively aware" of the risk and "a defendant's conduct involves a reckless risk if the risk . . . would have been obvious to a reasonable person."); *United States v. Lucien*, 347 F.3d 45, 56 (2nd Cir. 2003) (determining that the Ninth Circuit's "conclusion that a defendant does not have to subjectively know that his or her conduct created a serious bodily risk, is correct."); *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001) ("We do not believe that a defendant can escape the application of the serious risk of injury enhancement by claiming that he was not aware that his conduct created a serious risk, that is, a defendant does not have to subjectively know that his conduct created the risk.").

These circuits consistently reject the Eight Circuit's holding in *United States v. McCord, Inc.*, which adopts the Guideline's involuntary manslaughter definition of "reckless" as "a situation in which the defendant was aware of the risk created by his conduct." 143 F.3d 1095, 1098 (8th Cir. 1998) (citation omitted). A primary reason behind their rejections of this definition is that it renders the distinction between "conscious" and "reckless" meaningless, which is nonsensical in light of the Section's disjunctive phrasing, *i.e.*, "conscious *or* reckless risk." *See Maestas*, 642 F.3d at 1321; *Johansson,* 249 F.3d at 858; *Lucien*, 347 F.3d at 56.

The facts of this case, however, do not require that we decide today whether the enhancement applied by the district court required that Hernandez have subjective as opposed to objective knowledge of the risk of death or serious bodily injury. The PSR and PSR Addendum, the remainder of the record, and Hernandez's own admissions indicate that he was subjectively aware of the risk of death or serious bodily injury. Specifically,

No. 14-11080

Hernandez conceded that when he and the other COs reported to begin their 8:00 p.m. shifts, they were told by the officers on the prior shift that Bent was acting "crazy" and "suicidal" and had been holding up signs in his cell door that read "death" and "help."

On appeal, Hernandez points to the medical evaluation notes taken by prison medical personnel the day prior to Bent's suicide. These progress notes, however, have no bearing on Hernandez's subjective knowledge of the risk of suicide presented by Bent when he falsified the reports for his 12-hour shift on August 22nd through 23rd. According to the record, it was Rosas—*not Hernandez*—who had discussed Bent's afternoon medical evaluation with the officers from the previous shift and who was reportedly told that Bent was "thrown off" but "okay." However, even if Hernandez was made aware of Rosas's conversation with the other officers, that information is negated by the fact that COs working during the afternoon of the 1:20 p.m. evaluation reported to Hernandez that Bent was acting "crazy" during shift change, several hours *after* the evaluation. Further, there is no evidence in the record that Hernandez reviewed Bent's medical progress notes at any point or knew of their content prior to Bent's suicide, nor does Hernandez advance this argument on appeal. Further, as pointed out by the Government, it seems somewhat unlikely that officers who were unwilling to perform even one single mandatory duty involving safety checks and formal inmate counts would have taken the time to conduct an elective review of an inmate's medical progress notes. Additionally, Moore stated that the COs working in the control room that night after shift change (which included Hernandez) discussed a previous suicide attempt which took place in the SHU earlier that month, after being told of Bent's "crazy" and "suicidal" behavior by the officer's from the previous shift.

9

No. 14-11080

In sum, according to Hernandez's own admissions and the evidence in the record, we conclude that Hernandez had subjective knowledge—less than ten hours prior to Bent's death—that Bent presented a suicide risk. Hernandez was told that Bent was acting "suicidal," holding up signs that said "help" and "death," and had been moved to the SHU for high-risk inmates at his own request. Hernandez was present in the control room when several COs had a conversation about a previous suicide attempt by an inmate in the SHU earlier that month. Hernandez does not claim to have reviewed Bent's medical records or to have had personal knowledge that Bent was reported to have been "okay" after his medical evaluation earlier that day. Regardless, even if Hernandez did have personal knowledge of Bent's medical evaluation, that information was negated by the statements made by the officers who were working *after* Bent's medical evaluation who reported him as acting "crazy" several hours later during the shift change. These facts clearly show that Hernandez was made aware, almost immediately upon beginning his shift, that Bent presented a suicide risk.

Based on this evidence, the district court made a factual determination that Hernandez consciously or recklessly disregarded the risk of death or serious bodily injury when he falsified the reports indicating that the safety checks and counts had been performed when they had not. Moreover, even if it was not feasible for Hernandez to conduct every single count or safety check, his decision to decline to conduct even one single check or count during the entire 12-hour shift, in light of the information he conceded he knew about Bent's erratic behavior, supports the district court's factual determination that Hernandez consciously or recklessly disregarded the risk. Accordingly, the district court's conclusion that Hernandez's offenses under 18 U.S.C. §§ 1001 & 1002 involved "the conscious or reckless risk of death or serious bodily injury" was "plausible in light of the record as a whole." *See Duncan,* 191 F.3d

at 575 (citation omitted).  Consequently, we hold that the district court's application of the sentencing enhancement pursuant to U.S.S.G. § 2B.1(b)(15)(A) was not in error.  *Id.* (citation omitted).

### III. CONCLUSION

In light of the foregoing, the sentence of Defendant Frederick Hernandez is affirmed.